(611 P.2d 161)
No. 51,492

ALFONZO MAXWELL, Appellant, v. CITY OF TOPEKA and WORKMEN'S COMPENSATION FUND, *Appellees.*

Opinion filed May 16, 1980.

*Terry D. Watson,* of McCullough, Wareheim & LaBunker, of Topeka, for appellant.

*Dan E. Turner,* city attorney, for appellee City of Topeka.

*Wendell F. Cowan, Jr.,* of Colmery, McClure, Funk, Letourneau & Entz, of Topeka, for appellee Workmen's Compensation Fund.

Before ABBOTT, P.J., SWINEHART and MEYER, JJ.

ABBOTT, J.: This is a workers' compensation case in which claimant appeals from an order awarding him 30 percent permanent partial disability to the body as a whole. The award was assessed entirely against the Kansas Workmen's Compensation Fund.

Claimant presents two questions on appeal. He first contends the trial court erred in finding that he sustained only a 30 percent permanent partial disability to the body as a whole in that the finding is not supported by substantial competent evidence. The second issue is whether the trial court erred in computing claimant's average gross weekly wage for the purpose of determining claimant's permanent partial disability benefit.

1. Substantial Competent Evidence Issue

Claimant is employed as a distribution serviceman by the City of Topeka Water Department and has been so employed since 1964. He has a history of three prior low back injuries and low back pain. The City had filed a Form 88 notice of claimant's impairment. He suffered the back injury that is the subject of this appeal on June 20, 1976, while attempting to shut off a ten-inch water valve. He missed 110 days of work during the succeeding

ten months and received temporary total disability payment at the maximum rate for that lost time. Claimant was examined by two orthopedic surgeons, Dr. John A. Lynch and Dr. Nathan Shechter, both of whom advised claimant to do no lifting, bending or pushing of any heavy objects, and to minimize the possibility of further injury, he should not return to his old employment. Despite that advice, claimant returned to the same employment, which requires substantial physical exertion, and has remained in that employment, although experiencing some discomfort.

The examiner found claimant had a 40 percent permanent partial disability to the body as a whole. On director's review, the examiner's award was modified to 30 percent. The director noted that the award was subject to review and modification if claimant's condition changed. Claimant appealed. The district court affirmed the examiner's award as modified by the director.

Claimant first challenges the sufficiency of the evidence to support the disability rating. When reviewing a trial court's findings, it is not the function of an appellate court to judge the credibility of witnesses in workmen's compensation cases or to determine what weight should be given their testimony. The test on appeal is whether the record contains any substantial competent evidence which on any theory of credence justifies the trial court's findings. *Wilson v. Moridge Mfg., Inc.,* 2 Kan. App. 2d 374, 377, 579 P.2d 725 (1978). In reviewing the record to determine if it contains substantial evidence to support the district court's factual findings, this Court is required to review all evidence in the light most favorable to the prevailing party below; when the findings of fact made by the district court are based on substantial evidence, they are conclusive. *Makalous v. Kansas State Highway Commission,* 222 Kan. 477, Syl. ¶ 9, 565 P.2d 254 (1977).

Work disability was recently the subject of discussion in *Desbien v. Key Milling Co.,* 3 Kan. App. 2d 43, 45, 588 P.2d 482 (1979):

"While reference to functional disability and work disability may be confusing at times, our Supreme Court recently distinguished these terms as follows:
" 'The distinction between functional disability and work disability has been accepted by this court in most instances without explanation. Functional disability is the loss of a part of the total physiological capabilities of the human body. Work disability is that portion of the job requirements that a workman is unable to

perform by reason of an injury.' *Anderson v. Kinsley Sand & Gravel, Inc.,* 221 Kan. 191, 195, 558 P.2d 146 (1976).

"In determining work disability, the trier of fact looks for the extent of impairment to procure in the open market and to perform and retain work of the same type and character the worker was capable of performing before his injury. *Reichuber v. Cook Well Servicing,* 220 Kan. 93, 96, 551 P.2d 810 (1976)."

The pivotal question thus becomes, what portion of claimant's job requirements is he now unable to perform because of his injury?

Robert Lunnon, a distribution supervisor for the Water Department and claimant's immediate supervisor, testified that he could not tell any difference in claimant's work performance before or after the injury. Lunnon also testified that claimant continued to operate the jackhammer after his injury, "about the toughest [job] we've got." Roy Keiter, the distribution director of the Water Department, likewise testified that claimant's job performance was satisfactory, that he noticed no appreciable difference in claimant's performance since the injury, and that claimant made no attempt to avoid strenuous work after the injury. He further testified that claimant continued to generally perform the same kind of work since the accident as he had done prior to the accident. Claimant's foreman, Ed Horne, also testified that claimant continued to perform his normal work duties when he returned from his accident, although he did so more carefully. Claimant himself, in fact, admitted that he still does the same work he did before the accident. We are not permitted to substitute our judgment for that of the trier of facts. Although the medical testimony should be given great weight, the trier of facts is not bound by it. As we review the record, including the medical evidence, we conclude that it contains sufficient competent evidence to support the trial court's determination that claimant sustained a 30 percent permanent partial disability to the body as a whole.

2. Average Gross Weekly Wage

Claimant argues that the trial court erred in not computing the value of sick pay, vacation pay and contributions to Kansas Public Employees Retirement System (KPERS) and social security (FICA) made by his employer to arrive at claimant's average gross weekly wage.

The examiner determined that when the Workmen's Compensation Act is liberally construed, K.S.A. 1975 Supp. 44-511 in-

cludes employer contributions to FICA, KPERS and the monetary equivalent for vacation and sick leave. The director noted that during the time claimant was temporarily disabled, when the employer was not contributing to FICA and KPERS and the value of sick leave and vacation time was not accruing, claimant's base wage was such that he was entitled to the maximum benefit without considering any additional benefits; thus, even *if* the fringe benefits were includable, they would not change the amount of compensation due. When the claimant returned to work, contributions to FICA and KPERS were resumed and sick leave and vacation time started to accrue. The director held that the question was thus moot, reasoning that the employer contributions and the value of vacation and sick time should not be considered additional wages when the employee is again receiving those benefits while also receiving permanent partial disability compensation. The district court followed similar reasoning. We agree.

The pertinent parts of K.S.A. 1975 Supp. 44-511 are as follows:

"(*a*) As used in this section:

"(1) The term 'money' shall be construed to mean the gross remuneration, on an hourly, output, salary, commission or other basis, at which the service rendered is recompensed in money by the employer, but it shall not include any additional compensation, as defined in this section, any remuneration in any medium other than cash, or any other compensation or benefits received by the employee from the employer or any other source.

"(2) The term 'additional compensation' shall include and mean only the following . . . (D) the average weekly cash value of remuneration for services in any medium other than cash where such remuneration is in lieu of money, which shall be valued in terms of the average weekly cost to the employer of such remuneration for the employee and (E) employer-paid life insurance, health and accident insurance and employer contributions to pension and profit sharing plans: *Provided,* That the term 'additional compensation' shall not include the value of such remuneration until and unless such remuneration is discontinued due to injury: *Provided further,* That if such remuneration is discontinued subsequent to a computation of average gross weekly wages under this section, there shall be a recomputation to include such discontinued remuneration.

"(3) The term 'wage' shall be construed to mean the total of the money and any additional compensation which the employee receives for services rendered for the employer in whose employment the employee sustains an injury by accident arising out of and in the course of such employment.

. . . . .

"(8) In determining an employee's average gross weekly wage with respect to the employer against whom claim for compensation is made, no money or additional compensation paid to or received by the employee from such employer,

or from any source other than from such employer, shall be included as wages, except as provided in this section. No wages, other compensation or benefits of any type, except as provided in this section, shall be considered or included in determining the employee's average gross weekly wage."

This is a case of first impression in this jurisdiction. The statute is unique and appears to be original in that it was not "borrowed" in whole or in large part from another state. Extensive research into the statute's legislative history reveals no useful evidence of legislative intent.

Claimant takes the position that the statute means literally that if fringe benefits are *ever* interrupted due to injury, these benefits become "wages" within the meaning of K.S.A. 1975 Supp. 44-511(*a*)(3) and thus are permanently locked into the average gross weekly wage figure. It is important in deriving legislative intent to look at the *purpose* to be accomplished in passing the legislation. *Brown v. Keill,* 224 Kan. 195, Syl. ¶ 3, 580 P.2d 867 (1978). The logical purpose behind the provisos appears to be a desire by the legislature to ensure that only fringe benefits *actually lost* would be considered wages as defined in K.S.A. 1975 Supp. 44-511. Following this line of reasoning, benefits *restored* to a worker could no longer be calculated as part of the average gross weekly wage, except during the time the benefits are actually lost through discontinuance. This approach seems more reasonable than assuming the legislature intended that the worker without any benefit interruption would be entitled only to his base pay plus overtime over a possible 415-week interval while a fortunate worker who had a slight interruption in fringe benefits would be entitled to add that amount in his weekly wage for 415 weeks. This reasoning also squares with a comparable provision in the Michigan statutes which from its language more clearly expresses its intent:

"Average weekly wage means the weekly wage . . . inclusive of overtime, premium pay, and cost of living adjustment, and exclusive of any fringe or other benefits *which continue during disability* . . . ." Mich. Stat. Ann. § 17.237(371)(2) (1975) (emphasis supplied).

This statute appears to seek the same result as K.S.A. 1975 Supp. 44-511, but its language more clearly relates that it is the *loss of benefits* over the *period of disability* which is crucial. It appears under the language of this statute that benefits resumed during the period of disability would not be includable in computing

average weekly wage because they would then "continue during disability." It is true that workers' compensation statutes must be liberally construed in favor of injured workers (*Anderson v. Kinsley Sand & Gravel, Inc.,* 221 Kan. 191, 558 P.2d 146 [1976]); but this surely does not mean that the logical purpose behind the legislation can be totally ignored with the curious result that a permanently disabled worker whose fringe benefits have been interrupted for only one month is placed on identical footing with the injured worker whose fringe benefits have been cut off for seven years. In other words, such an interpretation places too much significance on the actual act of discontinuance when the logical reason for the provisos appears to have been a legislative attempt to add fringe benefits into a claimant's average weekly wage only when such benefits have, in fact, been cut off from the claimant. It is important to note the distinction between the "money" in wages (K.S.A. 1975 Supp. 44-511[*a*][1]) and "additional compensation" in wages. A worker could be permanently partially disabled, never lose one cent of his salary ("money"), and still be entitled to use that full salary as his base for computing his average gross weekly wage. However, the statute does not allow this same result for "additional compensation," because it requires a discontinuance of such benefits before they can be considered wages for the purpose of calculating average weekly wage. The legislature has manifested an intent to treat salary and fringe benefits *differently* in computing average gross weekly wage and the purpose underlying this disparate treatment must be considered in interpreting K.S.A. 1975 Supp. 44-511.

The Workmen's Compensation Fund offers an alternate approach to analyzing the statute while reaching the same result as the district court. It argues in its brief that "discontinue" requires a *permanent* termination of fringe benefits before they may be computed as part of the wages. Such an interpretation seems unwarranted, however, in light of the policy of liberal construction in favor of the injured worker and the fact the word "discontinued" standing alone does not connote permanent severance with no possibility of resumption. Had the legislature required this harsh result as a prerequisite for triggering K.S.A. 1975 Supp. 44-511(*a*)(2), it would have specifically stated there must be permanent termination.

We are of the opinion legislative intent was to preclude the

inclusion of additional compensation as defined in K.S.A. 1975 Supp. 44-511($a$)(2)(D) and (E) in an employee's average gross weekly wage during that period when such additional compensation is being paid to the employee, even though the additional compensation has been temporarily discontinued and then started again. Having so held, the remainder of the issues are moot and it is not necessary for us to determine if the FICA, KPERS and value of vacation and sick time constitute additional compensation.

Affirmed.