No. 64,352

SHARON K. HUGHES, *Claimant/Appellee*, v. INLAND CONTAINER CORPORATION, *Respondent/Appellant*, and HIGHLANDS INSURANCE COMPANY, *Carrier/Appellant*.

(799 P.2d 1011)

Opinion filed October 26, 1990.

*Joseph R. Ebbert*, of Niewald, Waldeck, Norris & Brown, of Overland Park, argued the cause and was on the briefs for appellants.

*Michael L. Sexton*, of Callen, Sexton & Shelor, of Kansas City, argued the cause and was on the brief for appellee.

*Dennis L. Horner* and *Keith C. Sevedge*, of Horner & Duckers, Chartered, of Kansas City, were on the brief for *amicus curiae* Kansas Association of Trial Lawyers.

*John M Ostrowski* and *Jan L. Fisher*, of McCullough, Wareheim & LaBunker, P.A., of Topeka, and *Thomas E. Hammond*, of Render & Kamas, of Wichita, were on the brief for *amicus curiae* Kansas AFL-CIO.

*Kip A. Kubin*, of Payne & Jones, Chartered, of Overland Park, was on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by the employer, Inland Container Corporation, and its insurance carrier, Highlands Insurance Company, from the judgment of the district court awarding compensation to the claimant, Sharon K. Hughes. The administrative law judge had denied the claim. The director of the Kansas Division of Workers Compensation had affirmed this decision. In an appeal to the district court, the district court found and awarded benefits for a permanent partial general disability of 48.25%. The employer and its insurance carrier appealed, and the appeal was transferred to this court pursuant to K.S.A. 20-3017.

Claimant alleges that she was injured while working for appellant Inland Container Corporation (Inland) at approximately 3:00 a.m. on July 9, 1987. She had been working for Inland about three weeks and was working in her third job assignment. As a bailer, she gathered scraps of waste and fed it into a bailer that shredded, compacted, and wrapped the waste. In performing this work, she had to lift stacks of waste weighing approximately 10 pounds each and put them into an auger. She had to pick up a 10-pound stack about every five minutes. The job required a lot of bending and lifting.

Claimant testified that she was pulling a 300- to 400-pound cart up an incline when she slipped on a piece of paper and began to fall. She was holding onto the cart and did not fall all the way to the ground. At the time, she felt a pull in her left hip. She moved her hips and determined that she was able to keep working. She finished her shift, leaving at about 5:00 a.m. and went home, showered, and went to bed. After sleeping for about four hours, she awoke in pain. She went to a chiropractor

she had used before, Dr. Meng, who gave her an adjustment, which allowed her to return to work. She reported for her next shift at 4:00 p.m. and did not feel any pain at that time. By 7:00 p.m., her left hip was causing her a lot of pain, and she realized she would not be able to complete the shift. She found two of her supervisors and told them she was in pain and wanted to leave. She complained of a general pain and did not advise her supervisors of a specific injury or of her visit to the chiropractor before beginning that shift.

Claimant's supervisors stated that when she met with them, she complained of soreness from the new job activity and did not mention a particular accident or injury. They advised claimant that they were short of help and that she could not leave unless she turned in her tools, in other words, that she quit. Her supervisors indicated that when she quit, claimant did not request medical care, walked normally, and acted happy to quit. Claimant testified that when she quit, she thought she would be able to return to her job if she had a doctor's excuse.

According to claimant, the pain intensified that night, keeping her from sitting or lying down. The next morning, she saw an orthopedic surgeon, who immediately admitted her to a hospital. He diagnosed a herniated L-5/S-1 disc. The hospital contacted Inland that day, inquiring about claimant's insurance. When Inland indicated claimant had no insurance because she had quit her job that day, the hospital informed Inland that she had been admitted complaining of an "industrial accident." Inland then sent claimant to its physicians, the Business and Industry Health Group. Following the hearing on her claim for workers compensation, the administrative law judge denied compensation on June 27, 1989, finding that "claimant has not met the burden of proof by substantial credible evidence that she sustained an accidental injury in the course of her employment with respondent around July 9, 1987." The director affirmed the finding by the administrative law judge. In the appeal to the District Court of Wyandotte County, the Hon. William M. Cook reversed the administrative law judge's decision, ruling that claimant had sustained an injury in the scope and course of her employment with Inland. The trial court found that claimant had sustained a permanent partial general disability of 48.25%.

The first issue on appeal is whether the record contains substantial competent evidence to support the trial court's finding that claimant received an accidental injury during the scope and course of her employment.

In a workers compensation proceeding, the claimant has the burden of proof to establish her right to an award of compensation and to prove the various conditions on which the claimant's right depends. K.S.A. 1989 Supp. 44-501(a). The burden of proof is "the burden of a party to persuade the trier of facts by a preponderance of the credible evidence that such party's position on an issue is more probably true than not true on the basis of the whole record." K.S.A. 1989 Supp. 44-508(g). The scope of review by a district court in a workers compensation case is by trial de novo on the record. The district court hears no new or additional evidence, but makes an independent adjudication of the facts and law based upon the transcript of the proceedings before the director of workers compensation. *Reeves v. Equipment Services Industries, Inc.*, 245 Kan. 165, 176, 777 P.2d 765 (1989).

In an appeal from the district court in a workers compensation case, the scope of review by an appellate court is to determine whether the district court's judgment is supported by substantial evidence. The evidence is viewed in the light most favorable to the party prevailing below, and, if substantial evidence supports the district court's factual findings, the appellate court does not reweigh the evidence or reverse the final order of the district court. In workers compensation cases, the term "substantial evidence" means "evidence that possesses something of substance and relevant consequence or evidence that furnishes a substantial basis of fact from which the issues presented can be reasonably resolved." *Baxter v. L.T. Walls Constr. Co.*, 241 Kan. 588, 591, 738 P.2d 445 (1987) (citing *Crabtree v. Beech Aircraft Corp.*, 229 Kan. 440, 442, 625 P.2d 453 [1981]); see, *e.g.*, *Maxwell v. City of Topeka*, 5 Kan. App. 2d 5, 6, 611 P.2d 161, *rev. denied* 228 Kan. 807 (1980). Substantial competent evidence is also defined as evidence that is relevant and that carries enough weight to allow one to conclude that the judgment is proper. *Harris v. Cessna Aircraft Co.*, 9 Kan. App. 2d 334, 335, 678 P.2d 178 (1984) (citing *Hardman v. City of Iola*, 219 Kan. 840, 844, 549 P.2d 1013 [1976]).

Inland argues that the record in the present case does not contain substantial competent evidence to establish claimant's injuries occurred during the course of her employment with Inland. In support of its argument, Inland notes that claimant did not report an accident to her employer through her supervisors or to Dr. Meng, the first chiropractor she visited. Claimant was treated by Dr. Meng less than two weeks before this alleged accident, and her visit of July 9, 1987, is not reported in Dr. Meng's records as resulting from any new injury. Further, claimant did not report her injury when she returned to work the next shift. After working only three hours, claimant told her supervisor that she was sore from new work activity and again reported no incident of slipping or other injury.

Further, Inland argues that the only evidence in support of a finding that the injury occurred in the course and scope of employment was claimant's testimony at the regular hearing in September 1988. Inland asserts that this testimony lacks credibility because of inconsistencies, which include claimant's denial on a job application with Inland in June 1987 that she had ever received any back injury or suffered any back pain. Even at the hearing, claimant denied that she had ever received an injury to the left hip causing pain prior to July 9, 1987. Yet Dr. Meng's records indicate that in November 1985, following a car accident, she complained of backache, left leg pain, and left hip pain. Inland further points to the vagueness of claimant's testimony concerning the details of the accident that allegedly caused her injury. She was unable to describe the accident except to report that she slipped on a piece of paper. Inland suggests that the accident was fabricated and argues that this is reinforced by claimant's failure to inform Dr. Edward Prostic, who was retained to evaluate claimant, of her prior history of left hip and low back complaints. Inland argues that claimant's description of the accident should be disregarded by this court as untrustworthy and that the district court's decision should be reversed because the untrustworthy nature of claimant's testimony precludes her from meeting her burden of proof to establish her right to compensation.

Claimant, on the other hand, points out that in workers compensation cases, the claimant is not required to establish the right

to an award by direct evidence alone or to produce an eyewitness to the accident. Instead, circumstantial evidence may be used to establish the claim and such evidence does not need to present a degree of certainty that excludes every reasonable conclusion other than that found by the trial court. *Pence v. Centex Construction Co.*, 189 Kan. 718, 725, 371 P.2d 100 (1962). Claimant further points out that uncontradicted evidence that is not improbable or unreasonable cannot be disregarded unless it is shown to be untrustworthy; ordinarily, it is regarded as conclusive. *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 197, 558 P.2d 146 (1976) (quoting *Berry v. Wondra*, 173 Kan. 273, Syl. ¶ 3, 246 P.2d 282 [1952]).

Claimant argues that the record supports her testimony that an injury occurred. She notes that the accident analysis form completed by Inland's personnel department supervisor, Calvin Bass, states that claimant suffered an "accident" on July 9, 1987, that was reported on the same shift. Furthermore, in discussing the cause of the accident, the report states that claimant had been "instructed on proper lifting procedures." Claimant suggests that it is incongruous that an accident analysis form verifying an accident would be completed by Inland's supervisory employees if they did not believe that an on-the-job accident had actually occurred.

The district court reviewed the record and reached a decision contrary to that of the administrative law judge. In support of its conclusions, the district court stated that claimant's testimony concerning her accident appeared credible. The court reviewed the accident as described by claimant and concluded that it "seems probable that an accident could have occurred as related by claimant, that the occurrence would not have been observed by her fellow workers, and that such an occurrence could have aggravated her preexisting condition." The court concluded that it was not unusual that claimant had not immediately notified her supervisor and had continued to work the night of the accident. Claimant did not realize she had suffered serious injury and did not become aware of it through treatment by the chiropractor, who did not conduct a thorough examination. When claimant saw the orthopedic surgeon the second day after the accident and was immediately hospitalized, she informed him of the accident and

Inland was, in turn, informed of the accident by hospital personnel.

The district court further noted that the only competent medical testimony in the record supports a finding that the incident on July 9, 1987, aggravated a preexisting degenerative disc condition at L-5/S-1. Although Dr. Prostic could not determine the degree to which the incident contributed to a preexisting condition, the doctor was able to give his opinion that part of claimant's 12.5% permanent partial functional disability was a direct result of the accident. Other evidence supported the doctor's conclusion, such as the fact that claimant did not suffer a disabling injury following the 1985 automobile accident, was never hospitalized for the automobile accident, and did not see medical doctors at that time. Dr. Meng's diagnosis of "lumbalgia," which includes almost any complaint of the lower back, did not contradict Dr. Prostic's findings. Furthermore, claimant was physically able to perform her job duties during her three weeks of employment with Inland, which is not indicative of a person with a disabling back condition. Therefore, the court concluded that claimant sustained a 12.5% functional impairment to the body as a whole as a result of the July 9, 1987, work-related accident that aggravated a preexisting degenerative disc condition at L-5/S-1.

We cannot say the decision reached by the district court is not supported by substantial competent evidence. The facts cited by the district court are substantive and relevant and furnish a substantial basis of fact to support the district court's resolution of the issues. It is not for this court to reweigh the evidence on this issue. *Reeves*, 245 Kan. at 176. The decision of the district court, finding that claimant had met her burden in establishing that she suffered a work-related accident during the scope and course of her employment with Inland, is supported by substantial competent evidence and is affirmed.

We next turn to the method used by the district court to determine permanent partial general disability pursuant to K.S.A. 1989 Supp. 44-510e(a). All the parties agree that the amendments to K.S.A. 44-510e that became effective July 1, 1987, altered the method for determining permanent partial general disability for those injuries covered by the Kansas Workers Compensation Act.

The changes in this statute became effective eight days before claimant's accident. A minimum of five possible methods are suggested by the participants in this appeal. The language which we must interpret provides as follows:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than [a] percentage of functional impairment. Functional impairment means the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence. There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury." K.S.A. 1989 Supp. 44-510e(a).

The fundamental rule of statutory construction is that the purpose and intent of the legislature governs when the intent can be ascertained from the statute. In construing statutes, the legislative intent is to be determined from a general consideration of the entire act. "Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible." *State v. Adee,* 241 Kan. 825, 829, 740 P.2d 611 (1987).

When the legislature revises an existing law, it is presumed that the legislature intended to change the law as it existed prior to the amendment. *State v. Adee,* 241 Kan. at 829 (citing *Curless v. Board of County Commissioners,* 197 Kan. 580, 587, 419 P.2d 876 [1966]). In determining legislative intent, the court is not required to examine only the language of the statute, but may properly "look into the causes which impel the statute's adoption, the objective sought to be attained, the statute's historical background and the effect the statute may have under the various constructions suggested." *In re Petition of City of Moran,* 238 Kan. 513, 520, 713 P.2d 451 (1986) (citing *State, ex rel., v. City of Overland Park,* 215 Kan. 700, 713, 527 P.2d 1340 [1974]); see, e.g., *State v. Freeman,* 236 Kan. 274, 288, 689 P.2d 885 (1984). In reviewing the historical background regarding the legislative

changes, the court may consider the legislative proceedings when the change is made during the course of the enactment and passage to determine legislative intent. *Hulme v. Woleslagel*, 208 Kan. 385, 392, 493 P.2d 541 (1972).

Claimant points out that Kansas has used two different methods for arriving at a claimant's permanent partial general disability under the Kansas Workers Compensation Act. Prior to 1974, the theoretical basis for allowing compensation was "the loss of earning power of the [worker]." *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. at 194. The standard that was employed to determine loss of earning capacity was the extent to which the worker's ability was impaired to procure employment in the open labor market and to perform and retain work of the same type and character that was performed before the injury. 221 Kan. at 194-95; see *Puckett v. Minter Drilling Co.*, 196 Kan. 196, 201, 410 P.2d 414 (1966). The earning capacity test did not consider a worker's ability to perform work of a different type, and a claimant was not denied compensation even if he or she could obtain work on the open market of a different kind and nature. See *Gutierrez v. Harper Construction Co.*, 194 Kan. 287, 290-91, 398 P.2d 278 (1965).

In 1974, the Kansas Legislature abandoned the earning capacity test and adopted the physical impairment theory for determining permanent partial general disability by amending K.S.A. 44-510e. Under the "physical impairment" test, the test for determining permanent partial general disability was the extent to which the injured worker's ability was impaired to engage in work of the same type and character which was being performed at the time of the injury. *Ploutz v. Ell-Kan Co.*, 9 Kan. App. 2d 9, 12, 668 P.2d 196 (1983), *aff'd* 234 Kan. 953, 676 P.2d 753 (1984) (quoting *Grounds v. Triple J Constr. Co.*, 4 Kan. App. 2d 325, 328, 606 P.2d 484, *rev. denied* 227 Kan. 927 [1980]). Under this theory, the court considers the percentage of the job requirements the claimant was performing at the time of the injury but could no longer perform. *Bigger v. Kansas Dept. of Revenue*, 11 Kan. App. 2d 108, 109-10, 715 P.2d 1038 (1985). Claimant's earning capacity or actual wage loss was not considered when determining permanent partial general disability. Under this test, it was possible for a worker to change job functions and earn the same

wages but still receive a maximum award for disabilities because the claimant could not perform work of the same type and character that was being performed at the time of the injury. See *Antwi v. C-E Industrial Group*, 5 Kan. App. 2d 53, 60-61, 612 P.2d 656, *aff'd* 228 Kan. 692, 619 P.2d 812 (1980). This method did not provide incentive for the past employers to rehabilitate the worker or accommodate the worker's disabilities. Dissatisfaction with the physical impairment test led the legislature to amend K.S.A. 44-510, effective July 1, 1987.

The parties agree on the basic reasons for the July 1, 1987, changes by the legislature, although they disagree about the importance of these reasons. The change was intended to modify the physical impairment theory, as interpreted by this court in *Ploutz* and *Bigger*, which could allow a worker an award of 100% permanent partial general disability even though the worker could return to a job earning full or better wages than before the injury. For illustration, the *amicus curiae* Kansas AFL-CIO brief points out that under *Ploutz*, no distinction was made between a 58-year-old worker with limited education who would never work again and a medical student working a summer job and suffering no real economic loss from the injury.

A second goal of the July 1, 1987, amendments to K.S.A. 44-510e was rehabilitation of the worker to return to the same or similar employment, with accommodation for the worker's disability if necessary. If the worker was unable to return to the same employment, a program of vocational education and training was encouraged. K.S.A. 1989 Supp. 44-510g(a) and (e)(1)(A) through (F).

Although the Act had provided for vocational rehabilitation procedures prior to the 1987 amendments, the Court of Appeals, in *Antwi*, 5 Kan. App. 2d 53, concluded that the award of partial disability must reflect the extent, after successful rehabilitation, that the injured worker's ability was reduced in performing work of the same type and character he had been performing when injured. Therefore, the court rejected the argument that the award should be based upon the injured worker's ability to perform work for which he was rehabilitated. 5 Kan. App. 2d at 61. The parties here agree that one purpose of the 1987 amendments was to correct the inequities created by the statute as interpreted

in *Antwi* by encouraging the employer to provide rehabilitation and accommodate the worker with disabilities.

Finally, the parties all agree that the legislature intended to provide a new formula for determining permanent partial general disability in order to correct the problems discussed above. The parties, however, disagree about the mechanics of how the formula is to operate.

The district court interpreted K.S.A. 1989 Supp. 44-510e(a) to mandate a dual test to determine whether a worker has sustained some work disability over and above his or her functional impairment. The court concluded that the dual tests are separate and distinct, noting that the legislature used the term "and" instead of "or" to clearly express its intent that both tests be utilized. The court concluded that it must "determine whether the *ability* of the injured worker to perform work in the open market *and* to earn comparable wages has been reduced, taking into consideration the worker's education, training, experience and capacity for rehabilitation." The following is a summary of the court's test and helps to illustrate the analysis used by the district court:

Work disability is:

(a) The extent to which the ability of the employee to perform work in the open labor market has been reduced, and,

(b) the extent to which the ability of the worker to earn comparable wages has been reduced.

In each case, the employee's education, training, experience, and capacity for rehabilitation must be considered.

In applying that test here, the court determined claimant's ability to perform in the open labor market by considering the testimony of Timothy R. Johnson, a vocational rehabilitation consultant. According to Johnson, prior to claimant's injury, claimant was capable of performing 8.78% of the jobs that exist in Kansas; following her injury, she was able to perform only 3.25% of such jobs. Johnson testified this resulted in a reduction in claimant's ability to perform work in the open market by 62.92%. However, this percentage is in error. (8.78% − 3.25% = 5.53% ÷ 8.78% = 62.98%.) In reaching this conclusion, Johnson considered the claimant's education, training, experience, and capacity for rehabilitation as well as her functional impairment and her con-

strictions. Johnson did not believe vocational training would increase claimant's ability to perform work in the open labor market because of her intelligence and basic academic level. Johnson's testimony was the only evidence concerning claimant's ability to perform work in the open labor market. The court accepted his calculation that claimant's ability to perform work in the open market was reduced by 62.92% because of her injury.

In determining claimant's ability to earn comparable wages, the court noted that she had earned a base wage of $8.18 per hour prior to the accident and now earns $5.00 per hour for Zenith Corporation in Ozark, Missouri. Johnson testified that claimant could increase her wage rate by 20% to 30% by moving back to the Kansas City area. The court concluded that in the Kansas City area, claimant was capable of earning a base wage of $6.25 per hour. It found no compelling reason for awarding a higher percentage for wage reduction because claimant had chosen to move to the wage-depressed area of southern Missouri. Expressed as a percentage, the court concluded that claimant's ability to earn comparable wages was reduced by 23.59% as a result of her injury. ($8.18 − $6.25 = $1.96 ÷ $8.18 = 23.59%.)

Having concluded that claimant's ability to perform work in the open market was reduced by 62.92% and that claimant's ability to earn comparable wages was reduced by 23.59%, the trial court averaged these two percentages and found that claimant suffered a 48.25% permanent partial general bodily disability as a result of her injury. The court awarded temporary total compensation in the sum of $250 and permanent partial compensation in the sum of $137.15 per week for a total of 414 weeks, for a combined total of $57,030.10. We note that the trial court's average of the two percentages is in error. The correct average percentage is 43.285%. (62.98% + 23.59% = 86.57% ÷ 2 = 43.285%.)

In formulating the two-part test, the trial court noted that the first test considering the claimant's ability to perform work in the open market was based upon a loss of earning capacity, while the second test considering the claimant's ability to earn comparable wages was based upon actual wage loss. The court pointed out that these concepts have been recognized as distinct and different. Here, the court found that the reduction in the claim-

ant's earning capacity is considerably greater than her actual wage loss, and, therefore, the two concepts materially affect the percentage of work disability to be awarded. The two-part test used by the trial court is supported by claimant and Kansas AFL-CIO.

Claimant argues that the legislature's use of the term "and" in framing the statute requires that it be given meaning according to its context and approved usage. Claimant argues that the court correctly concluded that use of the term "and" mandated consideration of both parts of the test and did not give the courts freedom to use one test and disregard the other.

Claimant also notes that the statute is silent on how the final percentage of disability should be computed. Here, the trial court chose to average the percentages reached on the two separate tests. Claimant approves this approach because it includes both tests in the final disability percentage but does not unduly emphasize either of them. Without using this approach, claimant points out, the trial court would be required to select a percentage from the two tests based upon some unknown criterion, which would arguably result in confusion and disagreement. Claimant notes that a statute should never be given a construction that leads to uncertainty, injustice, or confusion if it is possible to construe it otherwise.

Not surprisingly, Inland disagrees with the district court's two-part test interpretation. Inland argues there is only one test—reduction in claimant's *ability* to both "perform in the open labor market" and "to earn comparable wages." Therefore, according to Inland, the reduction in claimant's ability must be applied to both phrases, not just one, and the phrases in the statute were not separate tests but must be considered together.

If claimant has no reduction in ability to perform work "in the open market," then, according to Inland's interpretation, no award should be made for work disability. Likewise, if claimant has no reduction in her ability to earn wages comparable to pre-injury wages, then no award should be made for work disability. Inland concurs with *amicus curiae* Kansas Association of Defense Counsel (KADC) in asserting that, because claimant returned to substantial, gainful employment, the first element of the court's analysis should be zero. However, because claimant was able to earn comparable wages in the greater Kansas City area, her ability

to earn comparable wages was not diminished, and the amount the district court should assign to this element would also be zero. According to Inland, if any award is to be granted the claimant, it must be limited to 12.5%, the functional impairment.

KADC asserts that the court correctly stated the elements of the first test but argues that the court improperly focused upon the number of jobs available to the claimant before and after the injury. KADC argues that this court should reject the district court's mathematical application of the test because it leads to misinterpretation and speculation. KADC urged the court to look at the particular claimant's ability to enter the open labor market and perform work. Here, according to KADC, the court should have found that claimant's ability to perform work in the open labor market was not reduced since she returned to substantial, gainful employment, but would have found that claimant's ability to return to work at a comparable wage was reduced by 23.59%. Because this economic impairment is greater than her functional impairment of 12.5% as stated by the doctor, KADC argues claimant should be awarded 23.59% disability.

*Amicus curiae* Kansas Association of Trial Lawyers (KTLA) argues that the dual test used by the district court is incorrect because the averaging of the two percentages doubles the emphasis on any post-injury wage reduction. Although recognizing that the statute uses conjunctive language, KTLA asserts that the phrase "to perform work in the open labor market and to earn comparable wages" should not be two separately imposed tests because this interpretation adds to the plain language of the statute. The 1987 amendments emphasized the desire to return injured workers to the job market through vocational rehabilitation or accommodation by their employers. These factors must be included in the evaluation, which is not possible if a strict, two-step test is employed. The claimant was qualified to perform 8.78% of all jobs in the Kansas open labor market; after the injury, she was qualified to perform 3.25% of that market and, therefore, lost 62.98% of the open job market due to her injury. On cross-examination, Johnson noted that the remaining 3.25% of jobs for which claimant was qualified would be at comparable wages. KTLA argues that the trial court's averaging of actual wage loss was inappropriate because comparable wages were already fac-

tored. According to KTLA, claimant sustained a substantial reduction in her ability to compete for work in the job market.

Apparently, KTLA is arguing that the trial court should not have averaged the 62.98% for claimant's loss of her ability to perform work in the open market with the 23.59% calculation for claimant's ability to earn comparable wages. This would have resulted in a higher award—62.98% rather than 43.25%.

The 1987 amendment to K.S.A. 44-510e(a) eliminated as a factor, in determining permanent partial general disability, the claimant's ability to engage in work of the same type and character that she was performing at the time of the injury. As previously mentioned, the primary purpose of the amendment was to prevent a claimant from changing job functions and earning the same wages but still recovering a maximum award for disability. However, by using the phrase "ability of the employee to perform work in the open labor market," the legislature recognized that as a result of the injury, an employee may not be able to perform work that he or she could perform prior to the injury. Thus, the ability of the employee to perform in the open labor market is reduced and, consequently, what the employee can earn in wages is limited. Appellants contend that the phrases "to perform work in the open labor market" and "to earn comparable wages" are one and the same, and that actual wage loss is irrelevant unless it is a reflection of the ability to earn wages. Therefore, according to appellant, the only test is the ability to earn comparable wages, and if comparable wages are being earned or could be earned, then there is no work disability. We find this interpretation to be too narrow and to ignore one of the two factors to be considered in determining permanent partial general disability. The same is true of KADC's contention that, since claimant returned to full-time employment, she did not demonstrate that her ability to perform work in the open labor market was reduced, and therefore the award should be based solely upon her reduced ability to earn comparable wages.

If the legislature intended that the ability to earn comparable wages to be the only test, it could have easily done so by utilizing the language for determining temporary partial general disability also found in K.S.A. 44-510e(a). The legislature chose not to do that, and we cannot add or subtract from that which is set out

in the statute. We must construe the statute according to context and the approved usage of the language and give effect to the statute as clearly written. See *R.D. Andersen Constr. Co. v. Kansas Dept. of Human Resources*, 7 Kan. App. 2d 453, 458, 643 P.2d 1142, *rev. denied* 231 Kan. 801 (1982).

In so construing K.S.A. 1989 Supp. 44-510e(a), we conclude that both the reduction of a claimant's ability to perform work in the open labor market and the ability to earn comparable wages must be considered in determining the extent of permanent partial general disability.

In order to arrive at a percentage, a mathematical equation or formula must necessarily be utilized. The district court determined to give each element equal weight and averaged the two to arrive at a percentage. The statute is silent as to how this percentage is to be arrived at, and, absent any indication as to how this is to be accomplished, we cannot say that the district court erred in the method adopted and applied in the instant case. The finding that a claimant sustained a particular percentage of disability is a factual finding which will not be disturbed on appeal if supported by substantial evidence. *Bigger v. Kansas Dept. of Revenue*, 11 Kan. App. 2d at 111. The correct finding of a 43.285% permanent partial general disability is supported by substantial evidence.

The district court is affirmed as to its finding that the claimant is entitled to permanent partial general disability and reversed as to the amount of the award. The case is remanded with directions to correct the award to reflect a 43.285% permanent partial general disability.