130

(850 P.2d 271)

No. 67,961

ROBERT H. LYNCH, *Appellant/Cross-Appellee,* v. U.S.D. No. 480 and TRINITY INSURANCE, *Appellees ,* and THE KANSAS WORKERS COMPENSATION FUND, *Appellee/Cross-Appellant.*

Opinion filed March 12, 1993.

*Kerry McQueen* and *Shirla McQueen,* of Neubauer, Sharp, McQueen, Dreiling & Morain, P.A., of Liberal, for appellant.

*Wendel W. Wurst,* of Calihan, Brown, Burgardt & Wurst, of Garden City, for appellees U.S.D. No. 480 and Trinity Insurance.

*Tamara. L. Davis* and *Michael T. Harris,* of Hershberger, Patterson, Jones & Roth, of Wichita, for appellee The Kansas Workers Compensation Fund.

Before LEWIS, P.J., JOHN C. GARIGLIETTI, District Judge, assigned, and DONALD L. WHITE, District Judge Retired, assigned.

LEWIS, J.: Claimant appeals from various orders of the district court in a workers compensation case. The appellees include U.S.D. No. 480, the employer, and its insurance carrier, Trinity Insurance. The Workers Compensation Fund (Fund) was determined to be responsible for 100% of the award, and the Fund is an additional appellee and cross-appellant. The Fund was originally appealing the issue of apportionment of liability, but advises it no longer pursues that issue. We affirm in part, reverse in part, and remand.

This action has followed the usual route. The Administrative Law Judge (ALJ) made the initial rulings, which were appealed to the Director. The Director reversed the ALJ on the issue of claimant's average gross weekly wage and affirmed the ALJ on all other issues. The district court affirmed the award of the ALJ as modified by the Director. In so doing, the district court adopted and incorporated by reference the requisite portions of the decisions of the ALJ and the Director. Claimant appeals the decision of the district court.

Claimant was a carpentry instructor, working under a teacher's contract with U.S.D. No. 480. He sustained injury to his back while in the course of his employment. Claimant was 61 years of age at the time of the accident.

After the injuries, claimant's pain and disability became progressively worse. He continued in his duties and completed the 1988-89 school year. On March 1, 1989, he submitted his res-

ignation to U.S.D. No. 480, effective with the termination of the 1988-89 school year.

Claimant has not been employed on a substantial basis since the conclusion of the 1988-89 school year. The evidence indicates that claimant did not look for or find additional work after the conclusion of that school year. He submitted no job applications of any kind, and the only indication of work performed by claimant was that he had driven a wheat truck to help out a friend at harvest. The evidence also indicated that claimant was drawing a KPERS disability payment, which would have been terminated had he gone back to work.

According to the medical testimony presented, claimant had sustained a permanent functional disability of 15% as a result of his injuries.

Among other witnesses, claimant submitted the testimony of Jerry Hardin, an employment expert. Mr. Hardin testified that claimant's ability to perform work in the open market had been reduced by 60% and that his ability to earn comparable wages had been reduced by 42%.

At the time of his injury, claimant was receiving a salary of $40,796.00 from U.S.D. No. 480, plus the sum of $1,631.84 contributed by the school district to KPERS on claimant's behalf. The parties agree that the total compensation of claimant from U.S.D. No. 480 for the purposes of this action was $42,427.84.

Claimant's most recent contract with U.S.D. No. 480 stated, among other things: "The instructor agrees to perform school duties for 200 days beginning on the 17TH day of AUGUST, 1987. . . . The Board agrees to pay the above named qualified instructor an annual salary of $40,796.00."

Claimant testified that, under this contract, he was supposed to work 200 days and that, to divide that number by 5, it would be 40 weeks. He said that his duties for U.S.D. No. 480 started around the middle of August and finished around the first or second week of June. From the end of school to the middle of August, he was not obligated to U.S.D. No. 480 in any way, and he was free to do as he pleased during this time.

Claimant was paid his salary in 12 monthly installments. According to his testimony, as a schoolteacher he had an option to take his pay over a period of 9, 10, or 12 months. This option

was offered by the school district, and claimant had made an election to take his pay over a 12-month period.

The district court found an average gross weekly wage of $993.40 and a permanent partial general disability of 15%. Claimant appeals from both determinations.

## THE AVERAGE WEEKLY WAGE

The first issue concerns the calculation of claimant's average gross weekly wage. As noted in the facts, claimant is a schoolteacher. He earned his salary by performing the duties of a schoolteacher over the customary school year. We are unable to locate any prior Kansas decisions providing us with definitive guidance as to the calculation of the average gross weekly wage of a schoolteacher in the state of Kansas. The question appears to be one of first impression.

K.S.A. 1992 Supp. 44-511 provides the statutory basis for determination of a claimant's average gross weekly wage for workers compensation purposes. One of the questions we must decide is whether K.S.A. 1992 Supp. 44-511(b)(1), (2), (3), (4), or (5) is applicable. We begin by observing that none of the parties contends claimant's money rate was fixed by the month, week, or hour. We concur with the parties and eliminate the consideration of subsections (b)(2), (3), and (4).

The ALJ concluded that the calculation of claimant's average gross weekly wage was controlled by K.S.A. 1992 Supp. 44-511(b)(5). That portion of K.S.A. 1992 Supp. 44-511(b)(5) which is applicable to the issues on this appeal reads as follows:

"If at the time of the accident the money rate is fixed by the output of the employee, on a commission or percentage basis, on a flat-rate basis for performance of a specified job, or *on any other basis where the money rate is not fixed by the week, month, year or hour, and if the employee has been employed by the employer at least one calendar week immediately preceding the date of the accident, the average weekly wage shall be the gross amount of money earned during the number of calendar weeks so employed, up to a maximum of 26 calendar weeks immediately preceding the date of the accident, divided by the number of weeks employed, or by 26 as the case may be,* plus the average gross weekly value of any additional compensation and the value of the employee's average gross weekly overtime computed as provided in paragraph (4) of this subsection." (Emphasis added.)

The portion of the statute emphasized above is particularly applicable.

The ALJ calculated claimant's average gross weekly wage to be $1,489.06 (actually $1,484.98), as follows:

"The contract between the parties is attached to the transcript of the regular hearing as Claimant's Exhibit No. 2, and provides that the Claimant will perform school duties for 200 days beginning on August 17, 1987, and that he will be paid the sum of $40,796.00 for working that period of time In addition the Respondent contributes 4%, or $1,631.84 toward the Kansas Public Employees Retirement System on behalf of the Claimant. This results in the Claimant working a 200 day period of time for the [Respondent] for total compensation of $42,427.84. This particular contract does not fit neatly into any of the categories described in K.S.A. 44-511 in that the Claimant is not paid by the hour, week, month or year. It appears from the contract that the Claimant is paid by the day, based on a certain number of days worked. The only reasonable method of computing the Claimant's average weekly wage is to divide his $42,427.84 salary by the 200 days that he is contracted to work which results in a daily wage of $212.14. The Claimant's suggestion [is] that the contract amount should be divided by 40 weeks based upon [a] 5-day week; however, the school year is not exactly 40 weeks long. Respondent suggest[s] that the Claimant's compensation be divided by 52 weeks on the basis that the contract amounts to a yearly salary; however, the Claimant does not work the entire year for the Respondent; he only works 200 days of the year for the Respondent."

The Director agreed that K.S.A. 1992 Supp. 44-511(b)(5) applied but disagreed with the calculation of the ALJ. The Director calculated claimant's average gross weekly wage to be $993.40, as follows:

"The claimant had the option to be paid monthly over 12 months (which he exercised) even though the contractual obligation only required that he work from August through June. It is argued that because payments are made monthly the average gross weekly wage should be computed as provided by K.S.A. 44-511 where the money rate is fixed by the year or month. This would result in the total remuneration being divided by 52 weeks. Computation of the average gross weekly wage by this method would dilute the wage because the actual contractual work period was not for a 12 month year.

"The method of computation adopted by the Administrative Law Judge has the practical effect of determining the claimant worked 200 consecutive days eliminating weekends and holidays. This method artificially compressed the work period to 28.58 weeks and inflated the value of the average gross weekly wage. As previously noted, the claimant testified that although the contract provides for 200 work days in actuality the contractual obligation is to work the time period from August through June.

"It should be noted that if the money rate is fixed by the year, month or week the computation of the average gross weekly wage necessarily includes weekends and holidays in the computation.

"The contract of employment does not fit a situation where the money rate is fixed by the year, month, week or hour. However, K.S.A. 44-511(b)(5) does provide that if the money rate is fixed on any other basis other than the week, month, year or hour then the average gross weekly wage shall be the gross amount of money earned during the number of calendar weeks employed, up to a maximum of 26 calendar weeks immediately preceding the date of accident, divided by the number of weeks employed or by 26 weeks as the case may be.

"Herein, the manner in which the evidence was presented on the issue of the average weekly wage makes it impossible to strictly apply K.S.A. 44-511(b)(5) to the facts because there is no evidence regarding the gross amount of money earned for the 26 weeks immediately preceding the date of accident. Nonetheless, the statute provides guidance that the appropriate standard is to use the number of weeks employed as the divisor where the money rate is not fixed by the year, month, week or hour.

"The claimant worked from August 17, 1987, through at least June 10, 1988, according to the evidentiary record. This computes to a time period of 42.71 weeks. Using the 42.71 weeks actually worked as the divisor results in average gross weekly wage of $993.40."

As previously noted, the district court adopted the calculation of the Director.

On appeal, claimant argues that the calculation of the ALJ is correct. Claimant argues the Director erred in using a divisor of 42.71 weeks. It is submitted that the maximum divisor permitted by the statute is 26. Claimant divides his total salary by 28.57 weeks to find a weekly wage of $1,485.05. He then multiplies that figure by 26 weeks to obtain a total earned in 26 weeks of $38,611.30. The final calculation by claimant is to divide the gross earned in 26 weeks by 26, which completes a 360-degree turn back to an average gross weekly wage of $1,485.05.

U.S.D. No. 480 agrees with the calculation of the Director and the district court. The Fund takes an entirely different position. The Fund insists that the calculation is controlled by K.S.A. 1992 Supp. 44-511(b)(1). That provision of the statute provides the method of calculating the average gross weekly wage if the money rate is fixed by the year. The Fund, in its brief, argues:

"Both the statute and the contract of employment are clear and unambiguous. The Claimant's contract money rate of pay and the value of fringe benefits was fixed by the year; therefore, under the statute, the only ap-

propriate method of calculating the gross average weekly wage is to divide the sum of the annual rate of pay plus the annual value of fringe benefits by 52 weeks. The Claimant's gross average weekly wage as calculated under the statute is $816.04. Any other method of calculation is erroneous as a matter of law and contrary to the clear, unambiguous and mandatory language of the statute."

We have the option of either pursuing our own method of calculation or adopting one of the methods used or suggested. In summary, the calculations either found or suggested are as follows:

A. Administrative Law Judge ........................ $1,489.06
B. Claimant .......................................... $1,485.06
C. Director/District Court ........................... $ 993.40
D. Fund .............................................. $ 816.04

Our consideration of this issue leads us to conclude that the calculation made by the Director and adopted by the district court is correct, and we affirm the average gross weekly wage calculation of $993.40.

The method adopted by the Director comes closest to the true average gross weekly wage earned by the claimant over the school year for which he was employed. There is ample evidence in the record to indicate that claimant was to be paid $42,427.84 for working 200 days for respondent beginning in the middle of August and ending approximately the 10th day of June. Claimant was not being paid for 200 consecutive days of work. The contract called upon claimant to "perform school duties for 200 days, beginning on the 17TH day of AUGUST, 1987." Claimant's own testimony explained that the school year ran from August 17 to approximately June 10. He also indicated that he believed he worked 40 five-day weeks. If his contract were construed as being for 200 consecutive days beginning August 17, 1987, his duties under that agreement would have expired on March 3, 1988. This is contrary to claimant's testimony and to the agreement between claimant and U.S.D.' No. 480.

The evidence supports the determination that claimant was employed for 200 school days beginning August 17 and ending June 10. His contract covered a period of 299 days. The number of weeks in 299 days is 42.71. The claimant's contract called for him to work 200 days over a period of 42.71 weeks. This is very

close to the actual weeks in the school year. If the total money rate claimant was paid is divided by the number of weeks in the school year, the average gross weekly wage is $993.40.

The computations of the ALJ and those advanced by claimant artificially inflate the value of the average gross weekly wage. This method divides the total salary by the 200 days claimant was obligated to work, for a daily rate of $212.14, and multiplies that by seven, for a weekly wage of $1,489.06 (actually $1,484.98). The basic error of this computation is that it assumes claimant was to work 200 consecutive days. A calculation based on this supposition is neither supported by the evidence nor by the contract of employment. The supposition that claimant was to work 200 consecutive days results in his obligation to the school district having been completed long before the end of the school year. There is no support in the record for a finding that claimant's money rate was fixed by the day.

We also find little merit in the position advanced by the Fund. Its argument is premised on the use of the term "annual salary" in the contract and on the fact that claimant was paid his salary in 12 monthly installments. When taken in context, neither factor supports the argument that claimant's money rate was "fixed by year." In context, the term "annual salary" refers to the school year and not the calendar year. It is clear that claimant was being paid a salary to perform services for a school year that began August 17 and ended the following June 10. Claimant was not bound by contract to perform services over the period of one year to U.S.D. No. 480. It is, thus, inappropriate to determine his average gross weekly wage by using a divisor of 52. We conclude that K.S.A. 1992 Supp. 44-511(b)(1) applies to a contract where services are to be performed over a 12-month period. It does not refer to the typical teacher contract which requires services to be performed for a school year that runs approximately nine months. The contractual arrangement of a schoolteacher under these circumstances is not one where the money rate is fixed by the year.

The fact that claimant was paid in 12 installments is also not supportive of the premise that his money rate was fixed by the year. The record is uncontroverted that the school district permitted teachers to select, as an option, the number of months

over which their salary would be paid. The salary could be paid out over 9, 10, or 12 months at the option of the employee. The selection of a 12-month payout is a matter of convenience and does not convert the agreement into one where the money rate is fixed by the year. The selection of the payout period did not affect the obligation to work 200 days over a period of 42.71 weeks. The method suggested by the Fund artificially deflates the average gross weekly wage of claimant and is not supported by the evidence.

Claimant next argues that, under K.S.A. 1992 Supp. 44-511(b)(5), a divisor of 26 weeks must be utilized. Thus, he argues, it is error to divide the total wage by 42.71. We do not agree.

The method employed by the Director is the only method suggested by which the claimant's average gross weekly wage can be computed with a degree of exactness and logic. The statute suggests that the average gross weekly wage is to be computed by dividing the gross amount of money earned by "the number of weeks employed, or by 26 as the case may be." In the instant matter, we are able to utilize the exact number of weeks claimant was employed as a divisor. This, in our judgment, alleviates the requirement that the divisor be based on a 26-week period. We reject the concept that the statute requires the computation of a fictional average gross weekly wage when the precise average gross weekly wage can be computed by dividing the actual salary by the actual number of weeks employed. We construe the statute as requiring the use of a divisor of 26 only when the gross amount of money earned during that 26 weeks is readily available. We also conclude that, where the gross amount of money earned is readily available and the term over which it was earned was more than 26 weeks, the average gross weekly wage is calculated by dividing the money earned by the actual number of weeks worked. In the instant matter, claimant was employed for a period of 42.71 weeks. What he earned during 26 weeks of that agreement is neither relevant to the calculation of his average gross weekly wage, nor is it readily available.

We could, if we desired, manipulate the facts to fit the statute. The gross figure earned by the claimant over the first 26 weeks of his agreement can be determined by dividing his total salary by 42.71. This results in a weekly wage of $993.40. That figure

is then multiplied by 26 to obtain the gross amount earned during the 26-week period. The next step is to divide the gross amount earned by 26 to complete the circle and reach an average gross weekly wage of $993.40. This seems to us to be a cumbersome and unnecessary method of obtaining the same result that is reached by using a divisor of 42.71. It is, however, consistent with an inflexible statutory divisor of 26. We are not willing to conclude that the legislature intended to require such an exercise in mathematical gymnastics. We affirm the average gross weekly wage of $993.40 as computed by the Director and adopted by the district court.

## PERMANENT PARTIAL GENERAL DISABILITY

Claimant next argues that the district court erred in computing his permanent partial general disability at 15%. We agree and reverse and remand on this issue.

The Director and district court adopted the findings of the ALJ on this issue. The ALJ arrived at his calculation of disability in the following manner:

"The Claimant was evaluated by Jerry Hardin, a job placement specialist, who arrived at the opinion that the Claimant had a reduction in his ability to find work in the [open] labor market of 60%. He further testified that he was of the opinion that the Claimant suffered a reduction in his ability to earn comparable wages of 42%. Mr. Hardin testified at length as to the procedures that he used to arrive at his conclusions.

"K.S.A. 44-510e provides in part as follows: '. . . the extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than the percentage of functional impairment . . .' Although this is the standard by which permanent partial general disability shall be determined under the Kansas Statutes, it pre-supposes and assumes that the Claimant is a candidate for, or interested in, performing work in the open labor market and earning comparable wages. The case at bar is somewhat different than the normal case in that the Claimant has candidly, forthrightly, and honestly admitted that he is not interested in vocational rehabilitation, that he is not interested in joining the work force in the open labor market, that he is not interested in competing for comparable wages, and that he is interested in retiring. Although the Claimant went through a vocational rehabilitation evaluation at which these conclusions were arrived, and even though he was evaluated by a job placement specialist, apparently

solely for the purpose of arriving at some kind of work disability figure rather than applying that expert's abilities to finding the Claimant a job, the Claimant has not expressed an interest in returning to work, and, in fact, had not attempted to find any kind of work in the open labor market between the date of his injury in June of 1988 and the time of the Regular Hearing in April of 1991, a period of nearly three years. Each workers compensation case must be decided on its own merits. In this case, the Claimant has openly admitted that he has developed a plan for retirement, and intends to follow through with that plan."

The ALJ went on to hold: "The Claimant is entitled to a 15% permanent partial general disability."

The record shows the question of permanent partial general disability was decided without taking into consideration the factors required by *Hughes v. Inland Container Corp.*, 247 Kan. 407, 422, 799 P.2d 1011 (1990), and *Schad v. Hearthstone Nursing Center*, 16 Kan. App. 2d 50, 52-53, 816 P.2d 409 (1991). The ALJ concluded that the factors required to be considered by *Hughes* were irrelevant to the case at hand. He did so based on his conclusion that claimant had voluntarily retired. This was error.

Factually, we note that we do not read claimant's testimony in the same vein as did the ALJ. We are not attempting to weigh the evidence, but it is difficult for us to see where claimant candidly, forthrightly, and honestly admitted he was not interested in joining the work force. We do not, however, reverse because of that conclusion.

In *Brown v. The City of Wichita*, 17 Kan. App. 2d 72, Syl. ¶ 1, 832 P.2d 365 (1992), we held as follows:

"K.S.A. 1991 Supp. 44-510e(a) requires a balancing of two factors to determine the extent of permanent partial general disability: ability to perform work in the open labor market and ability to earn comparable wages. These factors must be considered in light of the employee's education, training, experience, and capacity for rehabilitation."

In *Brown*, it was apparent to us that the district court had not considered those two factors in arriving at its calculation of permanent partial general disability. We reversed, stating:

"We agree with the respondent. The statute requires a balancing of two factors: ability to perform work in the open labor market and ability to earn comparable wages. These factors must be considered in light of the employee's education, training, experience, and capacity for rehabilitation. *The*

*court must consider these factors to compute the percentage of the injured worker's disability. Hughes v. Inland Container Corp.,* 247 Kan. 407, 422, 799 P.2d 1011 (1990); *Schad v. Hearthstone Nursing Center,* 16 Kan. App. 2d 50, 816 P.2d 409 (1991)." (Emphasis added.) 17 Kan. App. 2d at 74.

We also held in *Brown* that "[w]e find that voluntary retirement in Kansas does not affect permanent partial general disability benefits." 17 Kan. App. 2d at 77.

We finally concluded in *Brown* as follows:

"Because claimant's retirement does not preclude him from proving a reduction in his *ability* to earn comparable wages, the case is remanded to the district court for a determination of that percentage. The district court must then create a formula for weighing that percentage with the 80% reduction in his ability to perform in the open labor market previously assessed to determine the extent of his permanent partial general disability." 17 Kan. App. 2d at 78.

This case is controlled by the *Brown* decision. The *Hughes* factors were not considered in computing claimant's general permanent partial disability. As we made very clear in *Brown,* these factors must be considered, and claimant's voluntary retirement, if it exists, does not exclude or excuse such consideration.

We remand this matter to the district court with directions to reconsider the issue of claimant's permanent partial general disability. We do not hold that a finding of 15% permanent partial general disability is absolutely unsupportable. That conclusion was reached, however, without a consideration of the two factors set forth in *Hughes, Schad,* and *Brown.* The district court must redetermine claimant's permanent partial general disability by considering those factors in the light of claimant's education, training, experience, and capacity for rehabilitation. If the district court has taken into consideration all of the required factors in determining claimant's permanent partial general disability, that decision will be sustained if supported by substantial competent evidence.

Affirmed in part, reversed in part, and remanded.