No. 34,854

Fred E. Woodring, Claimant, *Appellant*, v. United Sash & Door Company, Respondent, and Lumbermen's Mutual Casualty Company, Insurance Carrier, *Appellees*.

(103 P. 2d 837)

Opinion filed July 6, 1940.

*Alex H. Miller,* of Salina, for the appellant.

*C. W. Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger, E. S. Hampton, R. E. Haggart,* all of Salina, for the appellees.

The opinion of the court was delivered by

Dawson, C. J.: This is an appeal from a judgment setting aside an award of compensation for injuries sustained by the appellant, Fred E. Woodring, when his automobile turned over one night on a public road a few miles east of Salina.

The pertinent facts, stated in their least controversial aspects, were to this effect. For two years or more prior to January 25, 1938, appellant was a traveling salesman for the United Sash and Door Company of Wichita. His home was in Salina and he operated therefrom in a limited territory roundabout. His compensation was paid in commissions based on the proceeds of his sales, together with an allowance of $100 per month for traveling and hotel expenses. Appellant was privileged to select his own means of transportation

and had a large measure of discretion in prosecuting his employer's business.

On January 25, 1938, about 4 o'clock p. m., while appellant was at Tescott, about twenty miles northwest of Salina, he received a telephone call from his employer directing him to go to Enterprise, about thirty miles east of Salina, to see a man named Sumner who was reconstructing an old mill. The purpose of this errand was to procure the measurements and related details for the special jambs and window frames appellant's employer expected to supply. Appellant left Tescott about 4:30 p. m., and went to Minneapolis (which was considerably out of his way), and from there to Salina, where he merely stopped long enough to pick up a friend, Raymond Heck, and then Heck's sister, Mrs. Clarence McCown, and her husband. They traveled in appellant's automobile eastward, arriving in Enterprise about eight o'clock p. m. Appellant was informed that Sumner was in Abilene, five or six miles away. He made no further effort to meet Sumner, nor did he pay any further attention to the business for which he had come to Enterprise.

Appellant had two friends in Enterprise, Mr. and Mrs. Gordon Winn, who sold beer and other drinks and ran a dancing floor called the Nighthawk Inn. Appellant took his automobile guests to that place.

At this point in our narrative, a conflict of testimony begins as to the amount and character of the refreshments imbibed by appellant and their effect on him. He says he drank one bottle of beer and no more. Clarence McCown testified that appellant drank one highball with him. Mrs. McCown testified that a highball is a mixture of whisky and pop. The party tarried at the Nighthawk Inn for an hour or so. Appellant did not stay with his guests the entire time. When he reappeared preparatory to returning to Salina, Mrs. McCown testified that appellant acted as if he were intoxicated. Mr. McCown testified that he would not say "whether he was intoxicated or mad." McCown further testified that when they left the Nighthawk Inn, Raymond Heck drove the appellant's car.

McCown's testimony, in part, reads:

"Q. Why did he [Heck] drive from there? A. Mr. Winn suggested we take Fred [Woodring, appellant] home.

"Q. Why did he suggest that? What was his condition? A. He was just unruly.

"Q. After you got started on this drive, what was his demeanor, what did he do? A. We drove about five miles, coming into Abilene, and he kept

wanting to pull on the emergency drive, and knocking the driver to let him drive his own car, so I told my brother-in-law to let him drive his car.

"Q. During that time, where was he sitting?  A. In the back seat.

"Q. Did he reach up over the front seat?  A. Yes, sir; lunged over.

"Q. Did they change drivers?  A. Yes, sir.

"Q. Where was that done?  A. Right east of Abilene, before we hit the city limits.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. Did Woodring drive the car from the time he took the wheel there east of Abilene, up until the time of the collision [accident]?  A. Yes, sir.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. The seating arrangement, after you changed there, after Woodring took the wheel again, didn't change up until the time of the collision, or the upset?  A. No, sir.

"Q. Do you know who made the suggestion that you turn down to 15 and come on the Iron Avenue Road?  A. I did, sir.

"Q. Why did you make that suggestion?  A. Because he wasn't fit to drive on a state highway.

"Q. And that was on account of the liquor that he had taken there at the Nighthawk Inn?  Was that on account of any intoxication?  A. It would have been, or madness, either one.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. You don't claim he was under the influence of liquor, do you?  A. Yes, sir; or he was mad, either one.

"Q. There was nothing wrong with his driving at the time the tire broke out?  A. I kept telling him not to drive too fast."

Mrs. McCown testified:

"Q. Did you observe his condition there after you had been there [at Nighthawk Inn] for a little while, that is, Mr. Woodring's?  A. Yes, sir.

"Q. How did he act?  A. He acted like he was intoxicated.

"Q. When you got ready to leave, was there anybody in Mr. Woodring's presence who said anything about who should drive the car?  A. Yes.  Mr. Winn made the suggestion that my brother should, that it would be for the best.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. Well, what did Mr. Winn say about his driving the car.  Tell us that, as near as you can recollect?  A. He thought one of us should drive the car for him and see that he got home all right.

"Q. When you started from there, who drove the car?  A. My brother Raymond.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. Tell us what Woodring did?  A. Well, he wanted to drive his own car and kept jumping over and trying to put the emergency on, jerking the wheel out of his hand.

"Q. Did you folks finally stop and let Woodring drive?  A. Yes, sir.

.     .     .     .     .     .     .     .     .     .     .     .     .

"Q. From that time on, did Woodring drive all the way up until the time the car turned over? A. Yes, sir.

"Q. Was anything said there to Woodring about the way he should drive, anything of that kind? A. My husband told him to drive careful and keep down on the speed.

"Q. Did he say that more than once? A. Yes; we all did."

Raymond Heck, the third guest in appellant's automobile, testified:

"Q. What did Woodring and the rest of you do while you were in there [at Nighthawk Inn]? A. Oh, we sat down and drank a couple or three highballs, and my brother-in-law and sister danced, and I sat in there on a stool watching them.

"Q. Did you notice Woodring's condition there at that time after you had been there for a while? A. He was getting a little wild, was all.

"Q. When you got ready to start home, who started driving the car? A. I drove away from there.

"Q. Why did you drive? A. We came out to the car, so we decided—Mr. Winn said, well, better one of you folks start to drive, so I started to drive away from there, and after we got a ways he would keep grabbing the wheel, trying to open the door and jump, and grabbing the emergency brake, so we just decided to let him drive.

"Q. Do you know about how fast . . . Woodring drove, from the time he took the wheel up until the time of the upset? A. He drove a pretty good lick, going pretty fast.

"Q. I wish you would describe the actions of the car just before it turned over, and state whether or not you have an opinion as to what was the cause of the upset? A. Well, it just felt like something happened behind there all at once, it was just all over with—it just started screeching, turned over.

"Q. Were you driving at that time? A. No, sir.

"Q. Woodring was driving then? A. Yes, sir."

The appellant's testimony conflicted with that of all three of his guests. He repeatedly swore that Raymond Heck drove the car all the way from the Nighthawk Inn until the accident occurred. He also testified he had another business errand to attend to, which was to consult a school board about millwork for a new schoolhouse, and that *he did stop* en route for home for that purpose. His three guests testified positively that he did nothing of the sort.

The compensation commissioner found that appellant's injuries arose out of and in the course of his employment, and made an award of compensation in his behalf against his employer and his employer's insurance carrier.

From such finding and award the cause was appealed to the district court, which reached an opposite conclusion from its study of the record, its most important conclusion of fact reading thus:

"(1) The injury that the claimant received did not arise out of and in the course of his employment by respondent, and judgment should be for respondent and insurance carrier."

Judgment was accordingly rendered in favor of defendants, and the claimant appeals.

Having summarized the pertinent facts as fairly as they can be gleaned from the record, at the threshold of any consideration of the matters urged on our attention we must remind appellant that this court has little concern with disputed questions of fact in ordinary lawsuits, and none whatever in workmen's compensation cases except to ascertain whether the record contains any evidence which on any theory of credence or want of credence would justify the trial court's finding or conclusion of fact. We have that responsibility because it is a question of law. (*Fair v. Golden Rule Refining Co.*, 134 Kan. 623, 7 P. 2d 70; *Smith v. Cudahy Packing Co.*, 145 Kan. 36, 64 P. 2d 582; *Earhart v. Wible Ice & Cold Storage Co.*, 150 Kan. 695, 698, 95 P. 2d 366.)

It is of no avail here for appellant to argue that he was about the business of his employer when the accident happened, and that the fact that he had taken three guests along with him on that business errand to and from Enterprise when the accident happened was a mere incident which in no way affected his right to compensation. The testimony which the trial court chose to believe was amply sufficient to show that when appellant arrived at Enterprise and found that Sumner, whom he had come to see, was in Abilene, merely a few minutes' journey on the road towards his home in Salina, he dismissed all further concern about the business of his employer and set about his own pleasure and indulgence, as summarized above.

An examination of the pertinent law shows that compensation commissions and courts hold a very lenient attitude towards workmen who sustain injuries while under the influence of intoxicating liquors where there is also tenable grounds for holding that notwithstanding their liquor drinking their accidents did happen "out of and in the course of their employment." (*Nekoosa-Edwards P. Co. v. Industrial Commission*, 154 Wis. 105, 141 N. W. 1013, and note in L. R. A., n. s., 1916A 351-352.)

It may be conceded that where a business errand is the purpose of a workman's journey, the social incident of taking a few guests along for the pleasure of their company would not affect his right to compensation for an injury sustained in the performance of that errand; but where the business errand is finished or abandoned and the workman thereafter sets about the pursuit of his own pleasure or indulgence there is no theory of law or of justice which would impose on his employer the obligation to pay compensation for any injury sustained by the workman under such circumstances. Thus in *Pflug v. Roesch & Klinck*, 240 N. Y. S. 740, it was held:

"Where salesman, having permission to demonstrate automobile only to certain customer, did demonstrate it to such customer, and made written contract with him, subject to employer's approval, and thereafter, instead of returning to employer's office, went to another place for pleasure, and, while there, met acquaintance and took him for ride in automobile to demonstrate it, and had accident in which salesman was killed, accident did not occur in 'course of employment.'

"Where employee's errand at time of accident was one for recreation and social enjoyment, his risk of injury was personal."

In *Sheboygan Airways, Inc., v. Industrial Comm.*, 209 Wis. 352, 245 N. W. 178, it was held that—

"A pilot is not within the scope of his employment in giving personal acquaintances a free airplane ride solely for their enjoyment without benefiting or furthering his employer's interests, or giving a ride in exchange for liquor solely for personal use, or while in flight intentionally departing from the usual and customary method of operating an airplane in transporting passengers." (Syl. ¶ 3.)

In *R. & J. M'Crae v. Renfrew*, 51 S. L. R. 467, 7 B. W. C. C. 898, it was held that no recovery of compensation should be allowed the widow and children of a commercial traveler who went to a town on business, but instead of attending to it he became intoxicated, went to the depot to return home and was struck and fatally injured by a passing train.

In this case we note an intruding question which is, whether a workman, even if concededly engaged in his employer's service, could be permitted to recover compensation for an injury sustained while operating an automobile on the public highway under the influence of intoxicating liquor in violation of our statute which makes such an act a criminal offense punishable by fine or imprisonment or both. (G. S. 1939 Supp. 8-530.)

The judgment is affirmed.