(955 P.2d 1315)

No. 75,920

JUDITH ELAINE BROBST, *Claimant/Appellant/Cross-Appellee*, v. BRIGHTON PLACE NORTH, *Respondent/Appellee/Cross-Appellant*, CHURCH MUTUAL INSURANCE COMPANY, *Insurance Carrier/Appellee/Cross-Appellant*, and KANSAS WORKERS COMPENSATION FUND, *Appellee*.

Opinion filed May 23, 1997.

*E. J. Schumacher*, of Topeka, for the appellant/cross-appellee.

*Andrea S. Stubblefield*, of Dickson & Pope, P.A., of Topeka, for the appellees/cross-appellants Brighton Place North and Church Mutual Insurance Company.

*Jeff K. Cooper*, of Topeka, for the appellee Kansas Workers Compensation Fund.

Before BRAZIL, C.J., LEWIS, J., and JOHN ANDERSON III, District Judge, assigned.

ANDERSON, J.: Judith Elaine Brobst filed a workers compensation claim against respondent, Brighton Place North (Brighton Place), and its insurance carrier, Church Mutual Insurance Company (Church Mutual), regarding injuries suffered in two separate accidents. The administrative law judge (ALJ) granted Brobst an award, and the Workers Compensation Fund (Fund) was ordered to bear 33.33 percent of the total award. The Workers Compensation Board (Board) lowered the ALJ's 71.03 percent work disability award to 21 percent, and Brobst appeals that aspect of the Board's decision. Brighton Place and Church Mutual cross-appeal

the Board's decision that Brobst's second accident occurred in the course of her employment. We affirm.

On April 14, 1990, Brobst was working as a licensed practical nurse (LPN) for the Brighton Place nursing home when she injured her back and neck lifting a heavy patient. The parties do not dispute the nature and extent of this injury. Brobst reported the incident to Brighton Place and sought treatment from a chiropractor, Dr. Ron Warta. She received treatments from Dr. Warta and continued to see him weekly through the time of the preliminary hearing in this case. From the time of this accident until October 1990, Brobst continued to perform her regular job duties at Brighton Place.

To keep her LPN position at Brighton Place, Brobst had to maintain her nurse's license. On October 12, 1990, Brobst attended an all-day continuing education seminar at Washburn University. Brobst had learned about the seminar from a notice posted on a bulletin board at Brighton Place. After seeing the posting regarding the Washburn seminar, Brobst told her employer she wanted to attend, and, although Brighton Place did not pay Brobst any wages to attend, it gave her a check to cover the tuition for the seminar.

As Brobst was leaving the seminar to go home, she stepped off a curb to cross the street to the parking lot where her car was located, twisted her ankle, and fell to the ground. Brobst informed Brighton Place about the accident but went to work that night because there was no one to cover for her. Her ankle swelled after working on it all night, and Brobst went in to see her personal physician, Dr. Ethan Bickelhaupt. The fall had twisted her back again, and the ankle injury complicated the back problems by imposing an abnormal gait. Dr. Bickelhaupt recommended that Brobst see an orthopedic surgeon, Dr. Joseph Shaw.

Brobst stayed away from work to rest her ankle until October 30, 1990, when Brighton Place called to see if she could come in. She worked the 30th and 31st of October, but stopped working again when her back and ankle bothered her, and Dr. Bickelhaupt told her she needed to stay off her feet and could not give her a medical release to work. Brobst has not worked at Brighton Place

since October 31, 1990, and her position there has been filled in her absence.

Brobst later attempted to work as a private duty personal companion for an elderly lady but had to quit when the job began to require heavy lifting.

Brobst continued to receive treatment from Dr. Warta and Dr. Bickelhaupt. She has additionally been seen by three other doctors: Dr. Shaw, the orthopedic surgeon; Dr. Jeff Wade, of the Back in Action back rehabilitation center; and Dr. Gary Counselman, a chiropractor recommended to Brobst by Dr. Warta. Jerry Zook provided a vocational assessment/evaluation of Brobst.

Dr. Counselman and Dr. Warta each estimated Brobst's whole body impairment from the back injury at 5 percent, and Dr. Counselman recommended that Brobst discontinue future employment as an LPN if she would have to lift patients or stand or walk for extended periods. Dr. Shaw's work restrictions for Brobst include no lifting over 20 pounds, standing or sitting for long periods, or repetitive bending, twisting, or lifting. These work restrictions prevent employment as an LPN because of the nature of the work. Dr. Shaw estimated that Brobst had a 6 percent permanent partial disability of the body as a whole, with 2 percent attributable to her neck problems and 4 percent attributable to her back injury. In addition, Dr. Shaw estimated that half of the 6 percent impairment was attributable to the April 14 incident and half was attributable to the October 12 incident. Dr. Shaw believed the ankle injury had been resolved and that there was no permanent impairment to the ankle.

Brobst filed workers compensation claims alleging injuries occurring on April 14, October 12, and October 30-31, 1990. Brighton Place and Church Mutual impleaded the Fund.

The ALJ found that the April 14, 1990, injuries arose out of and in the course of Brobst's employment and designated the injury a 4 percent permanent partial general bodily disability, entitling Brobst to a total award of $3,436.20, with no designation for work disability because Brobst did not miss any work as a result of this first accident. The ALJ found that the October 12, 1990, Washburn injuries also arose out of and in the course of Brobst's employment

and found Brobst's work disability or permanent partial general bodily disability to be 71.03 percent, entitling Brobst to an award of $60,271.81. The ALJ found no compensable work injuries for the October 30-31, 1990, claim. The Fund was ordered to bear 33.33 percent of the total award on the two compensable claims.

Brighton Place and Church Mutual requested review by the Board, raising several issues, including whether the Washburn injuries were compensable and whether Brobst suffered a 71.03 percent work disability following the Washburn accident. The Board affirmed the ALJ's decision, except with regard to the work disability rating, which the Board lowered to 21 percent. Brobst appeals to this court, seeking reinstatement of the ALJ's work disability award, and Brighton Place and Church Mutual cross-appeal on the issue of whether the October 12 Washburn injuries arose out of and in the course of Brobst's employment.

The Act for Judicial Review and Civil Enforcement of Agency Actions, specifically K.S.A. 77- 621(c), provides the grounds upon which relief may be granted in appeals of workers compensation awards entered on or after October 1, 1993. See K.S.A. 1996 Supp. 44-556(a).

"The court shall grant relief only if it determines any one or more of the following:

. . . .

"(4) the agency has erroneously interpreted or applied the law;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole . . . ." K.S.A. 77-621(c).

Although this court may substitute its judgment for that of the Board on questions of law, on disputed issues of fact, an appellate court must view the evidence in the light most favorable to the prevailing party and determine if there is substantial competent evidence to support the Board's determinations. *Helms v. Pendergast*, 21 Kan. App. 2d 303, Syl. ¶ 3, 899 P.2d 501 (1995).

Brighton Place and Church Mutual appeal the Board's decision that the injuries sustained in the October 12, 1990, Washburn accident arose out of and in the course of Brobst's employment. The

question of whether there has been an accidental injury arising out of and in the course of employment is a question of fact, and its determination will not be disturbed by an appellate court where there is substantial evidence to sustain it. *Harris v. Bethany Medical Center*, 21 Kan. App. 2d 804, Syl. ¶ 1, 909 P.2d 657 (1995).

In employment covered by workers compensation laws, an employer must compensate an employee for personal injuries incurred by the employee through accidents arising out of and in the course of employment. *Kindel v. Ferco Rental, Inc.*, 258 Kan. 272, Syl. ¶ 2, 899 P.2d 1058 (1995); see K.S.A. 1996 Supp. 44-501(a). To affirm the Board's decision on this issue, this court must find substantial competent evidence to support the conclusion that attendance at the Washburn seminar was within the scope of Brobst's employment.

"The two phrases arising 'out of' and 'in the course of' employment, as used in our Workers Compensation Act, K.S.A. 44-501 *et seq.*, have separate and distinct meanings . . . . The phrase 'out of' employment points to the cause or origin of the accident and requires some causal connection between the accidental injury and the employment. . . . [A]n injury arises 'out of' employment if it arises out of the nature, conditions, obligations, and incidents of the employment. The phrase 'in the course of' employment relates to the time, place, and circumstances under which the accident occurred and means the injury happened while the worker was at work in the employer's service. [Citations omitted.]" 258 Kan. at 278.

Brighton Place and Church Mutual first argue that the Washburn seminar was not an incident of Brobst's employment. An employee's participation in educational or training programs or seminars may be considered within the scope of employment where such participation was clearly contemplated as incidental to the employment either as a matter of custom or under the contract of employment. 1A Larson's Workmen's Compensation Law 27.31(a), (c) (1996).

In *Blair v. Shaw*, 171 Kan. 524, 233 P.2d 731 (1951), an auto mechanic employed by a Chevrolet dealership died in an automobile accident on the highway while making the return trip to Fort Scott from Pittsburg, where he and his co-workers had attended an annual auto mechanics examination. The issue was whether the employee's death arose out of and in the course of his

employment. The court examined several circumstances in making its decision.

It was the policy and custom of Chevrolet to give an annual exam for auto mechanics employed by various Chevrolet agencies; the practice had existed for 15 years. Mechanics passing the written exam received certificates which made them more employable and which allowed their employers to advertise that they employed factory-trained mechanics. Although the claimant's employer in *Blair* provided the information on the time and location of the exam and paid for the gasoline used in the commute, the employer did not provide any other form of compensation for attendance, did not give definite instructions as to whether attendance was required, and had nothing to do with the giving of the exam. Nevertheless, attendance at the examination had become so common and accepted as to amount to a custom; employees expected to go and their employers expected them to. Under these facts and circumstances, the court concluded that the annual trip to take the exam was contemplated by the employment and had become so expected as to become incidental to the employment within the meaning of the Workers Compensation Act. 171 Kan. at 528.

In Brobst's case, attendance at continuing education seminars like the one at Washburn was clearly contemplated by her employment with Brighton Place. Brobst's position with Brighton Place depended upon Brobst maintaining her status as an LPN. In order to maintain that status, Brobst had to acquire 30 hours of continuing education credits. Although Brighton Place did not tell Brobst that she had to specifically attend the Washburn seminar, it posted the information regarding the seminar, knew that Brobst had chosen to attend that particular seminar to obtain some of her needed credits, and paid her tuition. Under these circumstances, and in light of the *Blair* holding, there was substantial competent evidence to support the Board's finding that Brobst's attendance at the Washburn seminar was an incident of her employment for workers compensation purposes.

However, Brighton Place and Church Mutual argue that even if the seminar was within the scope of Brobst's employment, that aspect of her employment ended when the seminar drew to a close

and Brobst's injuries, therefore, did not occur in the course of that employment because Brobst was injured as she was leaving the seminar, rather than at the seminar. Respondents argue that compensation for the Washburn injuries should be denied under the "going and coming" rule codified in the first sentence of K.S.A. 1996 Supp. 44-508(f), which states:

"The words 'arising out of and in the course of employment' as used in the workers compensation act shall not be construed to include injuries to the employee occurring while the employee is on the way to assume the duties of employment or after leaving such duties, the proximate cause of which injury is not the employer's negligence."

There are, however, at least three exceptions or qualifications to the going and coming rule. The first two—the premises and special hazard exceptions—were added to the Act in 1968, L. 1968, ch. 102, § 2, and are now stated in the second sentence of K.S.A. 1996 Supp. 44-508(f):

"An employee shall not be construed as being on the way to assume the duties of employment or having left such duties at a time when the worker is on the premises of the employer or on the only available route to or from work which is a route involving a special risk or hazard and which is a route not used by the public except in dealings with the employer."

For purposes of K.S.A. 1996 Supp. 44-508(f), Kansas narrowly construes the term premises to mean a place controlled by the employer. *Thompson v. Law Offices of Alan Joseph*, 256 Kan. 36, Syl. ¶ 1, 883 P.2d 768 (1994).

Brobst's accident would not fall under either of the statutory exceptions. She was not on her employer's premises when she was injured and was not using a special hazard route within the meaning of 44-508(f). If Brobst had simply been returning home from her ordinary work at Brighton Place when she twisted her ankle, and if this hypothetical accident had not qualified for either of the two statutory exceptions, Brobst would not qualify for compensation due to the going and coming rule. See generally *Thompson*, 256 Kan. 36 (discussing cases involving slip and fall injuries incurred while going or coming from work and finding no compensation where special premises and special hazard exceptions did not apply). However, Kansas case law recognizes a distinction be-

tween accidents incurred during the normal going and coming from a regular permanent work location and accidents incurred during going and coming in an employment in which the going and coming is an incident of the employment itself.

Under this third qualification to the going and coming rule, injuries incurred while going and coming from places where work-related tasks occur can be compensable where the traveling is (a) intrinsic to the profession or (b) required in order to complete some special work-related errand or special-purpose trip in the scope of the employment. This third exception has been noted in several Kansas cases, many of which post-date the 1968 premises and special hazard amendments to the Workers Compensation Act. See, *e.g.*, *Kindel*, 258 Kan. at 277; *Angleton v. Starkan, Inc.*, 250 Kan. 711, 718, 828 P.2d 933 (1992); *Bienz, Administratrix v. John Hancock Mutual Life Ins. Co.*, 195 Kan. 422, 427-29, 407 P.2d 222 (1965); *Blair*, 171 Kan. at 528; *Woodring v. United Sash & Door Co.*, 152 Kan. 413, 417-18, 103 P.2d 837 (1940); and *Messenger v. Sage Drilling Co.*, 9 Kan. App. 2d 435, 436-37, 680 P.2d 556, *rev. denied* 235 Kan. 1042 (1984).

It was this third exception to the going and coming rule which was critical in *Blair* when the employer in that case posed the same arguments as Brighton Place and Church Mutual in this case. The court responded as follows:

"Having concluded that the trip to Pittsburg to take the examination was a part of the employment, it seems entirely logical to conclude that the entire undertaking is to be considered from a unitary standpoint rather than divisible. To take the examination it was necessary for decedents to make the round trip to Pittsburg. That involved travel by private automobile—going and returning—one project, so to speak, and included the normal traffic hazards inherent in such an undertaking. The act does not require that the injury be sustained on or about the employer's premises. We think appellants' contention that the 'employment' was concluded the moment decedents finished the written examination and laid down their pencils is too narrow, particularly in view of the liberal construction of the act to which the workman is entitled under our many decisions." 171 Kan. at 529-30.

The Board in this case relied on this language and on the holding of *Blair* in arriving at its decision on this issue, and we can find no fault in this reliance. The rule in favor of liberally construing the

workers compensation statutes to award compensation where it is reasonably possible to do so is still recognized in Kansas, see *Kindel,* 258 Kan. at 284, and *Blair* is still good law. See *Kindel,* 258 at 277 (citing *Blair* as authority for this exception to the going and coming rule). Having concluded that the Washburn trip, like the trip to Pittsburg in *Blair,* was part of the employment, *Blair* requires viewing the entire undertaking as indivisible. Like the *Blair* employment, the employment in this case did not end with the final words spoken at the seminar. While Brobst's injury did not occur in a moving vehicle on the highway as had occurred in *Blair,* the undertaking required not only traveling in the vehicle, but also traversing on foot the distance between the seminar classroom and the place where the vehicle was parked. That on-foot portion of the trip included all the normal hazards involved in negotiating lots, streets, curbs, and walkways. If the whole trip is indivisible, then it includes all the normal risks involved in completing it, and Brobst's injuries should be compensable.

Brobst appeals the Board's decision that her work disability was only 21 percent. She asserts that the ALJ properly determined that her work disability was 71.03 percent. The existence, nature, and extent of the disability of an injured worker is a question of fact. *Armstrong v. City of Wichita,* 21 Kan. App. 2d 750, 756, 907 P.2d 923 (1995), *rev. denied* 259 Kan. 927 (1996). The question is whether there is substantial evidence to support this factual finding by the Board. Substantial evidence in such a case is evidence that possesses something of substance and relevant consequence or evidence that furnishes a substantial basis of fact from which the issues presented can be reasonably resolved. *Hughes v. Inland Container Corp.,* 247 Kan. 407, Syl. ¶ 3, 799 P.2d 1011 (1990).

In determining the extent and classification of a worker's disability, the law in effect at the time of the injury is applicable. See *Condon v. Boeing Co.,* 21 Kan. App. 2d 580, 588, 903 P.2d 775 (1995); *Berry v. Boeing Military Airplanes,* 20 Kan. App. 2d 220, 231, 885 P.2d 1261 (1994). Although the statute has since been amended, at the time of the accidents in this case, K.S.A. 1990 Supp. 44-510e provided the directive for determining the extent

of permanent partial general disability. The relevant portion of that statute reads:

"The extent of a permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced, taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general disability shall not be less than percentage of functional impairment." K.S.A. 1990 Supp. 44-510e(a).

In determining the extent of permanent partial general disability, or work disability, both the reduction of a claimant's ability to work in the open labor market and the ability to earn comparable wages must be considered, *Hughes*, 247 Kan. 407, Syl. ¶ 5, but the weight to be given to each side must be upheld if supported by substantial competent evidence, *Brown v. City of Wichita*, 17 Kan. App. 2d 72, Syl. ¶ 2, 832 P.2d 365, *rev. denied* 251 Kan. 937 (1992). Determining the percentage assigned to each element based on the evidence and then averaging the two percentages to arrive at a final disability percentage is an acceptable method of arriving at the extent of permanent partial general disability under the statute. See *Hughes*, 247 Kan. at 422.

The only evidence in this case regarding the claimant's reduction in ability to work in the open labor market were the records of vocational rehabilitation counselor Jerry Zook. Zook submitted a Vocational Assessment/Evaluation Addendum to document the claimant's wage potential and her rehabilitation options if she did not have the ongoing unrelated medical problems. In the first page of the assessment, Zook states the following:

"The client's previous experience as a Certified Nurses Aide, Certification Medication Aide and Licensed Practical Nurse would indicate she possesses transferable skills in the area of medical terminology. Based on the restrictions submitted by Joseph L. Shaw, M.D. and if only these restrictions were to apply it would seem reasonable the client could perform work as a Medical Records Clerk or perform clerical and secretarial work in a medical office or doctor's office. However, since the client has no previous experience in clerical work she would be required to take a nine month re-education and training program either as a Medical Records Clerk or Medical Secretary. Upon completion of such training the client could expect to earn, based on entry level wages in this field, an average

of $240.00 a week. After working for several years in this area the average weekly wage could reach $298.00 per week. The entry level wage would not return the client to comparable wage, however, comparable wage could be achieved with several years of experience. If the client were not to complete a re-education and training program and were to obtain work in the open labor market, entry level positions could be obtained. For example, Cashier positions could be obtained that would be within the restrictions assessed by Dr. Shaw, however, these are entry level positions and would pay minimum wage of $4.50 per hour."

The report later describes the findings of Dr. Shaw from a letter to Zook dated April 13, 1992, in which Dr. Shaw explained that Brobst had reached maximum medical recovery on her work-related injuries and stated that Brobst could not do any repetitive bending, stooping, lifting, or working for long periods of times with her arms overhead. These restrictions were expected to last for at least a year, at which time reassessment would be called for. The report notes several illnesses unrelated to Brobst's work injuries: symptomatic epigastric hernia, congestive heart failure and myocardiopathy, chronic obstructive pulmonary disease (COPD), and tachycardia. Finally, the report summary states:

"The client is a 48 year old female who was employed as a LPN at Brighton Place North until the injury on October 31, 1990. Dr. Shaw, the treating physician, diagnosed chronic mechanical back dysfunction. The client worked previously as a Cook, a Barmaid, a Certified Nurses Aide and a Certified Medication Aide. Her employer, Brighton Place North, is unable to take the client back due to the physical restrictions. Any effort to identify transferable skills is, at this time impossible, as the client has been too ill to take part in further assessments. The client appears to have significant medical problems unrelated to her industrial injury including a diagnosis of congestive heart failure, COPD and tachycardia. With existing transferable skills and applying only the restrictions directly related to her accident, the client may be employable, however, upon consideration of her complete medical condition, it is my opinion she is not placeable. Further vocational rehabilitation services would not benefit this client."

The ALJ had arrived at the 71.03 percent work disability figure by finding a wage loss of 42.05 percent and a labor market loss of 100 percent, and averaging the two numbers. The Board agreed with the wage loss estimation. However, the Board disagreed with regard to the labor market loss estimation, noting the absence of evidence regarding the labor market loss attributable to the work related injuries:

"Mr. Zook does not offer an opinion concerning claimant's loss of access to the open labor market as a result of her work-related injuries. It is apparent that she cannot return to her regular job duties as an LPN with the respondent. However, it is not apparent from the record what labor market loss could be assigned to this claim. . . .

. . . .

"[T]he record is lacking with regard to evidence of labor market loss. Mr. Zook's opinion to the effect that claimant is essentially unemployable relates to her overall condition at the time that he evaluated her from a vocational standpoint. This included the medical problems claimant developed or which were diagnosed after her last day of working for the respondent and which were conditions unrelated to her work-related injuries. Nowhere does he give an opinion of labor market loss utilizing the restrictions of Dr. Shaw . . . which result from the work-related injuries alone. As such, the Appeals Board finds that the claimant has failed to meet her burden of proof with regard to the loss of labor market access."

Although work-related aggravation of preexisting conditions can be compensable, *Harris v. Cessna Aircraft Co.*, 9 Kan. App. 2d 334, 336, 678 P.2d 178 (1984), workers compensation is not intended to provide compensation for debilitating medical conditions not created or exacerbated by work-related accidents or conditions. See *Boeckmann v. Goodyear Tire & Rubber Co.*, 210 Kan. 733, 738, 504 P.2d 625 (1972); and *West-Mills v. Dillon Companies, Inc.*, 18 Kan. App. 2d 561, Syl. ¶¶ 3, 4, 859 P.2d 382 (1993). Nevertheless, one factor to consider in determining work disability is the employee's capacity for rehabilitation, K.S.A. 1990 Supp. 44-510e(a), and this would seem to require consideration of physical and other limitations unrelated to the work injury which limit the capacity for rehabilitation. To this extent, Brobst's nonwork-related medical problems are relevant in determining her loss of access to the labor market and, ultimately, her work disability rating. However, these unrelated conditions should not take over the entire focus, allowing claimants essentially to be compensated for conditions not arising out of and in the course of their employment. The Board was attempting to avoid such an improper result.

In workers compensation proceedings, the claimant has the burden of proof to establish his or her right to an award of compensation and to prove the various conditions on which this right depends. K.S.A. 1996 Supp. 44-501(a). Brobst had the burden to

provide the Board with adequate evidence regarding the degree of loss of access to the labor market attributable to her work-related injuries. The Board found no substantial evidence regarding what portion of claimant's unemployability was attributable to her compensable injuries and thus assigned a zero percentage to that aspect of the formula. After averaging the 0.00 percent with the 42.05 percent wage loss figure and rounding down, the Board arrived at the 21 percent work disability rating.

The restrictions placed on claimant as a result of her work-related injuries probably subjected her to some loss of access to the labor market, but how much is indeterminable. Claimant's experts suggested no percentages, and claimant failed to offer some reasonable basis upon which the Board could assign a percentage to this aspect of her claim. The Board was not required to hazard a guess in the absence of competent evidence. The burden was on Brobst to prove each of the elements of her claim. She failed in that regard, and the Board should not have been required to pick a number out of thin air without some basis for determining what number would be too high and what number would be too low. Negative findings will seldom be set aside if the evidence is limited in quantity and its weight and credibility may be questionable, or if the evidence may be disregarded for any reason. *Harris*, 9 Kan. App. 2d at 335. The evidence in this case suffered from such limitations, and the Board's negative finding and its subsequent work disability determination should therefore be upheld.

Affirmed.