(36 P.3d 323)

No. 86,865

COLLETTE WATSON, *Appellee,* v. JOHNSON CONTROLS, INC., *Appellant.*

Opinion filed December 7, 2001.

*Denise E. Tomasic,* of Mustain, Higgins, Kolich, Lysaught & Tomasic, Chartered, of Kansas City, for the appellant.

*Dennis L. Horner,* of Horner and Duckers, Chartered, of Kansas City, for the appellee.

Before PIERRON, P.J., ELLIOTT, J., and WAHL, S.J.

PIERRON, J.: Johnson Controls, Inc., (Johnson) appeals the order of the Workers Compensation Board (Board) finding Collette Watson was entitled to a 50% work disability. We affirm.

Watson started working for Johnson in 1994 as a materials handler, using her hands and arms frequently to straighten bottles and lay tear sheets. In April 1995, she developed problems with her right elbow, right wrist, and her left side. Watson reported to her

supervisor and saw a company doctor for treatment. She was referred to Dr. Harris, who gave her a sling and released her to one-handed duty in May 1995. When her left arm started to have problems, she went to see Dr. Carabetta, who gave her an injection in both elbows and ordered her to get physical therapy.

Watson went back to work subject to restrictions that Dr. Carabetta gave her. She was laid off in November 1995 and received unemployment benefits. She was called back in January 1996, but declined to return to work.

In September 1996, Dr. Lynn Ketchum examined Watson, diagnosed bilateral epicondylitis, and recommended she wear hinged elbow braces when she returned to work. Dr. Ketchum also recommended that Watson should not do any repetitive gripping activities for 6 months and should be on a stretching program through physical therapy.

In October 1996, Watson obtained a full-time job at J.C. Penney through a temporary service. In December 1996, she quit working at J.C. Penney because she "[j]ust couldn't do it any more."

In January 1997, Watson was called back for a cleanup job at Johnson. The job involved sweeping the floor and pushing the trash cans after they were filled in order to keep the place clean. Watson worked only 1 full day and some hours the next day and eventually resigned from Johnson.

Following her resignation from Johnson, Watson worked for a few days at a grocery store owned by her friend, earning $6.50 per hour. She also worked in a laundromat at minimum wage, cleaning, sweeping, and doing some laundry, but she only stayed on the job for 3 hours. At the time of the hearing, Watson was babysitting at home for up to 4 days a week and earning $50 a week.

In February 1999, Dr. Ketchum examined Watson and concluded she was ready to return to work with the restrictions that she not have overhead work and not stay in the same posture around her shoulder girdle for prolonged periods. Dr. Ketchum rated Watson as having a 3% permanent partial impairment of both upper extremities for an impairment rating of the body as a whole of 4%, based on the diagnoses of mild left lateral humeral epicondylitis and bilateral myofascitis.

Dr. Jennifer Finley examined Watson on one occasion at the request of Watson's counsel and rated Watson as having a 15% impairment of the body as a whole caused by fibromyalgia. Her opinion was that Watson's fibromyalgia was caused by the injury sustained at Johnson.

Michael J. Dreiling, a vocational rehabilitation counselor, evaluated Watson's employability and stated:

"Considering the kind of work she performed in the past, her limited educational background and the significant medical restrictions that have now been given to her, I am not overly optimistic about her ability to return to work in the labor market and earn a comparable salary.

"It is my opinion that Ms. Watson will need very selective job placement assistance to find work that would allow her to stay within her medical restrictions and would be consistent with her educational background, work experience and skills.

"In summary, it appears that Ms. Watson always relied on her good physical capabilities, especially the use of her upper extremities, to perform work in the labor market, which is now contraindicated by her restrictions. She will experience a significant loss in terms of her ability to perform job tasks as a result of her medical restrictions."

A vocational rehabilitation consultant called by Johnson, Gary Weimholt, testified Watson could be making approximately $240 to $320 a week in the open labor market. He was of the opinion that Watson did not conduct an effective job search after her injury.

The administrative law judge (ALJ) found that Watson had a 9.5% functional impairment to the body as a whole, a 23.5% task loss, and a 40% wage loss, which were averaged together to be a 31.75% work disability. The ALJ imputed an amount of $290 a week as the wages that Watson would be capable of earning.

Watson appealed the order of the ALJ, and the Board modified the ALJ's award by finding Watson was entitled to a 50% permanent partial general disability. The Board affirmed the ALJ's finding that Watson sustained a 9.5% whole body permanent functional impairment as a result of her work-related injuries. The Board found a 60% task loss (averaging Dr. Finley's 78% and Dr. Ketchum's 42%) and a 40% wage loss, reaching a 50% work disability. The Board affirmed the $290 imputed post-injury average weekly wage.

This court must review the Board's findings to determine whether they are supported by substantial competent evidence. *Brobst v. Brighton Place North*, 24 Kan. App. 2d 766, 775, 955 P.2d 1315 (1997). Substantial competent evidence is evidence that furnishes a substantial basis in fact from which the issues presented can be reasonably resolved. 24 Kan. App. 2d at 775. The determination of whether the Board's findings are supported by substantial competent evidence is a question of law. *Roberts v. J.C. Penney Co.*, 263 Kan. 270, 274, 949 P.2d 613 (1997).

First, Johnson argues that Watson's workers compensation award should have been limited to benefits for a functional impairment because she voluntarily resigned from the accommodated position at Johnson. Next, Johnson claims the Board made mistakes in computing an imputed average weekly wage of $290; it contends that Watson's average weekly wage should have been $320 and that her task loss of 60% should have been 42%. Last, Johnson argues Watson did not sustain her burden of proof of functional permanent partial impairment.

An appellate court, in reviewing a workers compensation case, is required to view the evidence in a light most favorable to the prevailing party. *Woodward v. Beech Aircraft Corp.*, 24 Kan. App. 2d 510, 513, 949 P.2d 1149 (1997). Johnson wants the Court of Appeals to accept certain evidence over other substantial conflicting testimony and pass on the credibility of the witnesses contrary to the findings of the Board. This is exactly what this court cannot do. See *Griffin v. Dale Willey Pontiac-Cadillac-GMC Truck, Inc.*, 268 Kan. 33, 34, 991 P.2d 406 (1999).

The evidence indicates Watson was offered another position for cleanup duty by Johnson; however, she had difficulty in performing the duty because of her medical problems. The ALJ and the Board imputed an average weekly wage of $290 for Watson, based on the testimony that she could be making approximately $240 to $320 a week in the open labor market. This is not an arbitrary finding by the Board. Findings supported by substantial evidence will be upheld by an appellate court even though evidence in the record would have supported contrary findings. *Copeland v. Johnson*

*Group, Inc.*, 26 Kan. App. 2d 803, 806, 995 P.2d 369 (1999), *rev. denied* 269 Kan. 931 (2000) (*Copeland II*).

Furthermore, this court cannot disregard the testimony by Dreiling and should not give greater weight to Weimholt's analysis on the issue of task loss, even though Johnson strongly urges us to do so.

Johnson further argues that Watson failed to bear the burden of proof because of the weak medical testimony. However, there is more than sufficient evidence to support the Board's finding that Watson suffered from medical conditions that were caused by the work-related injuries sustained at Johnson, and Watson was entitled to compensation for her permanent partial impairment.

Johnson also asks this court to "refine" the standards for determining a disability award that have been developed through *Copeland II*, 26 Kan. App. 2d 803; *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 944 P.2d 179 (1997)(*Copeland I*); and *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

Specifically, Johnson appears to be asking for stricter penalties for not making a bona fide search for employment. We see no need for this. Under *Copeland I*: "If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages." 24 Kan. App. 2d at 320.

This is precisely what the Board did. A failure to make a good faith effort simply allowed the Board to make its decision on facts which may be less favorable to the claimant had a good faith effort to find employment been made.

Substantial competent evidence supports the Board's findings.

Affirmed.