(154 P.3d 15)

No. 94,604

LARRY JO RASH, *Appellee*, v. HEARTLAND CEMENT COMPANY and SENTRY INSURANCE, *Appellants*.

Opinion filed July 14, 2006.

*Kurt W. Ratzlaff* and *Janell Jenkins Foster*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, for the appellants.

*William L. Phalen* and *J. Lee Ayres*, of Phalen, Bicknell & Markel, of Pittsburg, for the appellee.

Before PIERRON, P.J., GREEN and JOHNSON, JJ.

PIERRON J.: Heartland Cement Company (Heartland) and its insurance carrier, Sentry Insurance, appeal the decision of the Workers Compensation Board (Board) awarding Larry Jo Rash workers compensation benefits based on a 65% work disability. Heartland argues the Board erred in not limiting Rash's benefits to a 16% functional impairment rating because Rash failed to ac-

cept accommodated employment. Heartland also argues that the Board erred in failing to allow an offset for Rash's retirement benefits. We find the evidence submitted supports the Board's findings and affirm.

Rash had worked for Heartland for 34 years. In August 1999, he was employed as a maintenance journeyman and his job duties involved heavy lifting and moving large machinery in order to repair and weld the equipment. Rash worked 40 hours per week, plus an average of 5-6 hours of overtime. His wage was $17.80 per hour, and Heartland also paid for all of his benefits, including health, life, and disability insurance and a 401K plan.

On August 30, 1999, Rash injured his back while lifting a piece of metal. At the time of the injury, he was 55 years old. Rash saw Heartland's company doctor, Dr. Wilkins, who prescribed pain pills and muscle relaxers and sent him back to work. Rash continued to work at Heartland. He testified his condition continued to get worse. Heartland would not send him back to the doctor. Rash sought independent medical treatment and was examined by Dr. Larry Atwood. After testing, Dr. Atwood treated Rash with pain pills and muscle relaxers. Rash filed for workers compensation benefits on November 21, 2001.

Rash next sought treatment from Dr. Bradley Bruner, a foot and leg specialist. Dr. Bruner referred Rash to Dr. Amrani. Dr. Amrani scheduled Rash for surgery, but then cancelled the surgery after determining that it would not help Rash's problems. Dr. Amrani then referred Rash to Dr. Stein.

Rash reinjured his back on January 9, 2002, while cleaning up the shop and lifting another large piece of metal. Rash reported the injury, and Heartland sent him back to Dr. Wilkins and then to Dr. Arnold. Eventually Dr. Pollock performed back surgery on him. The surgery was scheduled for July 22, 2002, but Rash had a massive heart attack which required quadruple bypass surgery. Rash was not given any work restrictions as a result of his heart attack, and it did not affect his ability to work. Rash had back surgery on February 3, 2003.

In June 2003, Rash began preparation of retirement paperwork so that he could retire effective July 31, 2003. Heartland's person-

nel administrator, Paula Beeman, testified that Rash filled out the paperwork for retirement benefits from both Heartland and its predecessor U.S. Steel. She testified that as of July 15, 2003, when she and Rash signed the necessary documents, his retirement had been approved.

Heartland offered Rash an accommodated position and told him to report to work on August 25, 2003. Rash reported for work on August 25, but he remained in the change house the entire day and did not engage in any tasks. Rash was informed that if he decided not to retire, he needed to complete employment papers in order to be back on the system to clock his time and get paid. Rash did the same thing on August 26.

On August 27, 2006, Rash had another appointment with Dr. Pollock, and following the appointment, Dr. Pollock restricted Rash from performing any further work: "Maximum lifting 20 lbs. at home with occas. bending, twisting, standing as tolerated. Patient cannot return to work. He has reached MMI." Dr. Pollock opined that Rash had a 11% functional impairment and a 48% task loss.

Dr. Edward Prostic performed an independent medical examination on Rash in December 2001 and again in October 2003. Dr. Prostic opined that Rash suffered an injury to his lower back in the course of his employment with Heartland and adopted the same restrictions as Dr. Pollock. Dr. Prostic gave Rash a 20% functional impairment rating and a 63% loss of work tasks.

Monty Longacre, a vocational rehabilitation counselor and job placement specialist, evaluated Rash for both task loss and wage loss. Longacre identified jobs on the Internet or in the newspaper within Rash's work restrictions. These jobs ranged in pay from $5.25 to $8 per hour, with one job as an outside sales position with a communications company paying up to $40,000 per year.

The administrative law judge (ALJ) relied on Dr. Pollock's determination that Rash had a 25% functional impairment to the body as a whole based on the diagnosis-related estimates (DRE) method and that Dr. Pollock had not used the DRE method when he previously rated Rash with an 11% functional impairment. The ALJ acknowledged all the task loss and wage loss determinations

by the various doctors in this case but denied work disability benefits due to Rash's receipt of retirement benefits, stating: "[F]ollowing the *Willie McIntosh v. Sedgwick County* case of 91,097 in the Court of Appeals of the State of Kansas, [32 Kan. App. 2d 889, 91 P.3d 545, *rev. denied* 278 Kan. 846 (2004),] I find that K.S.A. 44-501h applies and that the Claimant is not entitled to a duplication of wage loss and therefore award only a 25% impairment of function to the body as a whole." Rash appealed the decision to the Board.

The Board disagreed with the ALJ's decision and concluded that under *Watson v. Johnson Controls, Inc.*, 29 Kan. App. 2d 1078, 36 P.3d 323 (2001), when a worker fails to make a good faith effort to find appropriate employment, he or she is not automatically limited to the functional impairment rating. Rather, the postinjury wage for the permanent partial general disability formula should be based upon all the evidence, including expert testimony concerning the worker's retained capacity to earn wages.

The Board averaged the 11% functional impairment rating offered by Dr. Pollock and the 20% functional impairment rating offered by Dr. Prostic and concluded Rash had a 16% impairment of function to the body as a whole. The Board found Rash had not made a good faith effort to find appropriate employment and the evidence was overwhelming that Rash's low back injury did not prevent him from working, nor had the doctors restricted him from working. However, the Board concluded there was no evidence of what wages Rash would have been paid in his accommodated position at Heartland and Longacre's opinion regarding Rash's retained ability to earn wages was the only opinion of record. Based on Longacre's opinion that Rash could now earn $265.60 per week and his stipulated preinjury wage was $1,036.82, the Board concluded that Rash had a 74% wage loss. The Board also averaged the doctors' opinions of Rash's task loss and concluded that he had sustained a 56% task loss due to his work-related injury. The average of the wage loss and task loss resulted in a 65% work disability, and Rash was awarded benefits based on a 65% work disability.

The Board rejected Heartland's argument that Rash's benefits should be reduced by the amount of retirement benefits he was receiving. The Board held that the provisions regarding retirement benefit reduction under K.S.A. 44-501(h) do not apply to Social Security disability benefits. The Board also found Heartland had failed in its burden to prove the pension was a company pension based on Beeman's testimony that Rash's retirement pension came from funds he had paid into the retirement plan.

The Board's decision was not unanimous. The dissent agreed with the majority that Rash had failed to make a good faith effort and the record had failed to set forth the wages he would have earned in the accommodated job. However, the dissent stated: "But we would find that it was more probably true than not true that the accommodated job would have paid a wage that was comparable to claimant's pre-injury wage, which would limit claimant's permanent partial general disability to his 16 percent whole person functional impairment rating."

Heartland first argues the Board erred in not limiting Rash's benefits to the percentage of his functional impairment.

K.S.A. 2005 Supp. 44-556(a) specifically subjects workers compensation appeals to the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq*. The KJRA limits the relief granted on appeal to just a few issues, including the agency's erroneous interpretation of law and findings of fact not supported by substantial evidence when viewed in light of the record as a whole. K.S.A. 77-621(c)(4) and (7). The 1993 workers compensation amendments limited review of all orders after October 1, 1993, to questions of law. See K.S.A. 2005 Supp. 44-556(a). Whether the Board's findings of fact are supported by substantial competent evidence is a question of law. *Tovar v. IBP, Inc.*, 15 Kan. App. 2d 782, 784, 817 P.2d 212, *rev. denied* 249 Kan. 778 (1991).

K.S.A. 44-510e(a) provides for permanent partial general disability so long as the claimant is not making postinjury wages equal to 90% or more of the claimant's preinjury average weekly wage:

"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the employee, in the opinion of the physician, has lost

the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident, averaged together with the difference between the average weekly wage the worker was earning at the time of the injury and the average weekly wage the worker is earning after the injury. In any event, the extent of permanent partial general disability shall not be less than the percentage of functional impairment. Functional impairment means the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, if the impairment is contained therein. An employee shall not be entitled to receive permanent partial general disability compensation in excess of the percentage of functional impairment as long as the employee is engaging in any work for wages equal to 90% or more of the average gross weekly wage that the employee was earning at the time of the injury."

Our courts, however, have denied work disability where the claimant is capable of earning a postinjury wage but fails to do so. See *Lowmaster v. Modine Mfg. Co.*, 25 Kan. App. 2d 215, 217, 962 P.2d 1100, *rev. denied* 265 Kan. 885 (1998); *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 318-19, 944 P.2d 179 (1997); *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 284, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995). "[A]n employee must set forth a good faith effort to secure appropriate employment before work disability will be awarded. [Citations omitted.]" *Cavender v. PIP Printing, Inc.*, 31 Kan. App. 2d 127, 130, 61 P.3d 101 (2003).

In *Foulk*, decided in 1994, the claimant refused to accept an accommodated position offered by her employer but still claimed that she was entitled to work disability. The *Foulk* court disagreed:

"The legislature clearly intended for a worker not to receive compensation where the worker was still capable of earning nearly the same wage. Further, it would be unreasonable for this court to conclude that the legislature intended to encourage workers to merely sit at home, refuse to work, and take advantage of the workers compensation system." 20 Kan. App. 2d at 284.

Three years later, in *Copeland*, this court, attempting to harmonize the language of K.S.A. 44-510e(a) with the principles of *Foulk*, stated:

"[W]e find the factfinder must first make a finding of whether a claimant has made a good faith effort to find appropriate employment. If such a finding is

made, the difference in pre-and post-injury wages based on the actual wages can be made. This may lead to a finding of lesser wages, perhaps even zero wages, notwithstanding expert opinion to the contrary.

"If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages." *Copeland*, 24 Kan. App. 2d at 320.

In *Lowmaster*, the claimant was injured on the job, saw a doctor, worked 2 more days on the job, and then quit. She then filed a workers compensation claim. The respondent could have offered accommodated employment but did not do so. The Board held it could not say that the claimant would have refused accommodated employment; therefore, the facts were materially different than *Foulk*, and the claimant was granted work disability. This court reversed and remanded for further proceedings consistent with *Foulk* and *Copeland. Lowmaster*, 25 Kan. App. 2d at 218-19.

In *Oliver v. Boeing Co.*, 26 Kan. App. 2d 74, 76, 977 P.2d 288, *rev. denied* 267 Kan. 889 (1999), we stated that *Foulk, Copeland,* and *Lowmaster* "create an exception and hold that a claimant is barred from wage loss compensation if he or she is capable of earning 90% or more of the employee's preinjury wage level within medical restrictions but fails to do so." Oliver was injured while working for Boeing. He sought medical treatment and was temporarily placed in a lighter duty position. He was later placed back in his original position, and the pain reoccurred. Oliver sought medical treatment, and a doctor diagnosed early carpal tunnel syndrome; however, Oliver was not given medical restrictions, and he resigned. After his resignation, Oliver was employed by a construction company but again was forced to quit because the work aggravated his condition. He ultimately found a job making less money than he did at Boeing. At that point, Oliver filed a workers compensation claim and was awarded a wage loss.

On appeal, Boeing argued that Oliver did not give it the opportunity to offer an accommodated position before he quit. Boeing suggested that according to the Board's decision, an employee had a legal duty to request accommodated employment once medical restrictions had been issued. On appeal, the *Oliver* court held:

"Neither K.S.A. 1998 Supp. 44-510e(a) nor *Foulk's* policy exception require a claimant to seek post-injury accommodated work from his or her employer in every circumstance. The statute is concerned only with how much is made, not where the claimant is working. *Foulk* and its progeny are concerned with a claimant who is able to work but refuses to do so. Boeing does not cite any law supporting an absolute duty to seek accommodated work from the employer before looking elsewhere.

"Just as the Act does not impose an affirmative duty upon the employer to offer accommodated work, [citation omitted], it also does not establish an affirmative duty upon the employee to request accommodated work. Whether a claimant requested accommodated work from an employer is just one factor, viewed along with the rest of the record, in determining whether the claimant in good faith attempted to obtain appropriate work.

"Boeing points out its interest in avoiding liability under the Act and argues it would have readily accommodated Oliver once legitimate restrictions were in place. While Boeing raises a notable point, this sort of broad interest balancing is best left to the legislature." 26 Kan. App. 2d at 77.

In order to avoid the *Foulk* exception, the claimant must make a good faith effort to find appropriate employment. *Copeland*, 24 Kan. App. 2d at 320. The factfinder makes that determination. *Parsons v. Seaboard Farms, Inc.*, 27 Kan. App. 2d 843, 846, 9 P.3d 591 (2000). The claimant generally has the burden to show good faith. See, *e.g., Cavender*, 31 Kan. App. 2d at 133 (claimant met burden of showing good faith effort to find appropriate employment); but see *Palmer v. Lindberg Heat Treating*, 31 Kan. App. 2d 1, 4, 59 P.3d 352 (2002) (If the employer contests the claimant's continuing good faith efforts to find appropriate employment after the workers compensation hearing, it has the burden of proof as that term is defined by K.S.A. 2005 Supp. 44-508[g]).

"Any inquiry into the good faith of an employee's efforts to find appropriate employment must proceed on a case-by-case basis. Where the Board finds an employee made a good faith effort, the Board's determination will be upheld if supported by substantial competent evidence. Where the Board finds an employee did not make a good faith effort, the Board's determination will be upheld absent an arbitrary disregard of uncontroverted evidence or an extrinsic consideration such as bias, passion, or prejudice." *Parsons*, 27 Kan. App. 2d at 848.

In awarding Rash work disability, the Board based its decision on *Watson*, 29 Kan. App. 2d 1078. In that case, Watson began having problems with her right elbow, right wrist, and left side,

and then later with her left arm. After treatment, Watson returned to work but was laid off and then later declined to return to work for Johnson Controls. She began working full time at J.C. Penney but quit because she could not do the work anymore. Johnson called Watson back to work in a light-duty cleanup job. She worked 1 and ½ days and then resigned. She then had jobs at a grocery store, a laundromat, and an in-home daycare. The ALJ found Watson had a 9.5% functional impairment and, after computation, a 31.75% work disability. The Board affirmed the functional impairment rating but modified the award by finding that Watson was entitled to a 50% work disability.

On appeal, Johnson argued that Watson's workers compensation award should have been limited to benefits for functional impairment because she voluntarily resigned from an accommodated position. The *Watson* court rejected Johnson's argument:

"Johnson also asks this court to 'refine' the standards for determining a disability award that have been developed through *Copeland II*, 26 Kan. App. 2d 803[, 995 P.2d 369 (1999)]; *Copeland v. Johnson Group, Inc.*, 24 Kan. App. 2d 306, 944 P.2d 179 (1997) (*Copeland I*); and *Foulk v. Colonial Terrace*, 20 Kan. App. 2d 277, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995).

"Specifically, Johnson appears to be asking for stricter penalties for not making a bona fide search for employment. We see no need for this. Under *Copeland I*: 'If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages.' 24 Kan. App. 2d at 320.

"This is precisely what the Board did. A failure to make a good faith effort simply allowed the Board to make its decision on facts which may be less favorable to the claimant had a good faith effort to find employment been made." *Watson*, 29 Kan. App. 2d at 1082.

Heartland argues this case is controlled by *Foulk* and *Copeland* and the Board has erroneously applied *Watson*. Heartland argues that application of the above case law should result in a finding that Rash is clearly not entitled to an award of benefits over and above his functional impairment. Heartland states that Rash failed to even attempt the offered accommodated work and should be limited to functional impairment as was the case in *Foulk*.

Rash contends the Board correctly applied the above case law in concluding that since he did not make a good faith effort to find postinjury employment, it was necessary to determine the appropriate postinjury wage based on all the evidence. See *Copeland,* 24 Kan. App. 2d at 320. We agree. Rash states that Heartland does not challenge the substance of the Board's decision that he had a 74% wage loss and a 56% task loss resulting in a 65% disability rating. Consequently, Rash states there is substantial competent evidence to support the Board's conclusion on work disability.

We find the Board correctly resolved this case considering the evidence presented, and we affirm its findings of facts and conclusions of law. It appears the Board relied heavily on the fact that there was no testimony regarding the pay rate for the accommodated job offered by Heartland. This is apparently confirmed by the dissent to the Board's decision, which speculated that Rash would have earned the same wage in the accommodated position. We, like the Board's majority, will not engage in speculation. The only evidence of postinjury wages and Rash's capacity to earn wages came from Longacre's opinion regarding Rash's retained ability to earn wages. Based on Longacre's opinion that Rash could now earn $265.60 per week and that his stipulated preinjury wage was $1,036.82, the Board concluded that Rash had a 74% wage loss. As noted earlier, the *Copeland* court announced: "If a finding is made that a good faith effort has not been made, the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages." 24 Kan. App. 2d at 320. There was no evidence presented to counter Longacre's opinion and it was the only evidence before the Board on the nature of potential postinjury employment for Rash.

The determination of Rash's postinjury wage does not rise to the 90% wage level penalty in K.S.A. 44-510e. Consequently we will not limit Rash's work disability to the value of his functional impairment. See *Oliver,* 26 Kan. App. 2d at 77 ("The statute is concerned only with how much is made, not where the claimant is working.").

Heartland would have us punish employees with a harsher result for not accepting accommodated employment. This argument is contrary to *Oliver*. The lesson from *Oliver* is that an employer is not required to offer accommodated employment. Equally, an employee is not required to accept an offer of accommodated employment from his or her employer. The offering or accepting of accommodated employment is simply another factor in determining whether the employee has engaged in a good faith effort to seek appropriate employment. An employee who rejects an offer of accommodated employment has a good faith duty to seek appropriate employment within his or her restrictions. If the employee fails in this effort, "the factfinder will have to determine an appropriate post-injury wage based on all the evidence before it, including expert testimony concerning the capacity to earn wages." *Copeland*, 24 Kan. App. 2d at 320.

The Board's conclusion of a 65% work disability rating for Rash is supported by the evidence. The Board did not err in concluding that Rash was entitled to work disability beyond his functional impairment. The result requested by Heartland would require a statutory change.

Heartland also argues the Board erred in not allowing an offset for the retirement benefits Rash was receiving. Heartland argues the ALJ entered the proper award by reducing Rash's workers compensation benefits by his retirement benefits and the ALJ's award should be reinstated.

K.S.A. 44-501(h) provides:

"If the employee is receiving retirement benefits under the federal social security act or retirement benefits from any other retirement system, program or plan which is provided by the employer against which the claim is being made, any compensation benefit payments which the employee is eligible to receive under the workers compensation act for such claim shall be reduced by the weekly equivalent amount of the total amount of all such retirement benefits, less any portion of any such retirement benefit, other than retirement benefits under the federal social security act, that is attributable to payments or contributions made by the employee, but in no event shall the workers compensation benefit be less than the workers compensation benefit payable for the employee's percentage of functional impairment."

At the time of the regular hearing, Rash was receiving monthly payments of $1,563 from Social Security disability and $538 from Heartland and its predecessor. Rash testified he had not paid any money for the pension he received from Heartland; it was part of the fringe benefit package negotiated by the union. Beeman testified the pension money Rash was receiving from Heartland was money he had paid into the pension plan and is now being paid back to him.

Heartland argues this case should be remanded to the ALJ for determination of the exact nature of the funds being paid to Rash as retirement benefits because of the conflicting testimony of Rash and Beeman. Heartland states that it asked the Board to remand to the ALJ for this determination, but the request was denied. Rash argues the Board judged the evidence before it and determined Beeman's testimony was the most reliable. Rash correctly states that it is not the position of this court to reweigh the evidence or pass on the credibility of the witnesses. Heartland asks for a remand to present additional evidence on this topic.

In a workers compensation case, the burden of proof is on the claimant to establish the right to an award. *Perez v. IBP, Inc.*, 16 Kan. App. 2d 277, 279, 826 P.2d 520 (1991). Once the claimant has met this burden, the respondent employer has the burden to demonstrate any exception.

The Board found that Heartland had not carried its burden of proof on this issue. The Board found that Heartland failed to prove the pension was a company pension based on Beeman's testimony that Rash's retirement pension came from funds Rash had paid into the retirement plan. This is a negative finding that will not be disturbed on appeal unless there was an arbitrary disregard for undisputed evidence or an extrinsic consideration such as bias, passion, or prejudice. *Nance v. Harvey County*, 263 Kan. 542, 551, 952 P.2d 411 (1997). Further, this court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 387, 22 P.3d 124 (2001).

We find no such extrinsic considerations present in this case. The Board relied not on evidence from Rash but from Beeman,

the personnel administrator for Heartland, in determining that Rash's pension was from his contributions. We agree with the Board's decision that Heartland failed to carry its burden of proof in this regard. We further are not inclined to set aside the Board's negative finding because of the absence of any extrinsic factors. We hold that the Board did not err in refusing to apply an offset for retirement benefits under K.S.A. 44-501(h).

Although Heartland's evidence may not have been presented as clearly as Heartland would have wanted, we are not in a position to grant "overs."

Affirmed.